# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2387

ERNO KALMAN ABELESZ *et al.*,*

*Plaintiffs-Appellees*,

*v.*

MAGYAR NEMZETI BANK,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

---

* These appeals had been captioned "*Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*," and "*Victims of the Hungarian Holocaust v. Hungarian State Railways*." We have reformed the captions to reflect the first named plaintiffs. Federal Rule of Civil Procedure 10(a) requires pleadings to name parties, not to presume the merits of the plaintiffs' claims, no matter how compelling they may be. We have also revised the caption in the railway case to reflect the proper Hungarian name of the railway, which is abbreviated "MÁV."

No. 11-2791

PAUL CHAIM SHLOMO FISCHER *et al.*,

*Plaintiffs-Appellees*,

*v.*

MAGYAR ÁLLAMVASUTAK ZRT.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-00868—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED JANUARY 11, 2012—DECIDED AUGUST 22, 2012

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Holocaust survivors and heirs of other Holocaust victims have sued several Hungarian banks and the Hungarian national railway in a U.S. district court alleging that the banks and the national railway participated in expropriating property from Hungarian Jews who were victims of the Holocaust. These two district court cases have produced nine separate pending appeals and mandamus petitions in this court. In this opinion, we address the claims against the Hungarian national bank, defendant Magyar Nemzeti Bank (the "national bank"), and the claims against the Hungarian national railway, Magyar

Államvasutak Zrt. (the "national railway"). In separate opinions released today, we address the claims against three other private banks.[1]

Plaintiffs' complaints describe a part of the tragic, historic crimes that were the Holocaust, and in particular the arrest, detention, transport, and murder of Hungarian Jews, starting in large numbers relatively late, in 1944, as Soviet armies were advancing west toward the Third Reich and the countries it dominated, including Hungary. The plaintiffs allege that both the national bank and the national railway played critical roles in the expropriation of Jewish property that was essential to finance the genocide of the Holocaust in Hungary. The plaintiffs suing the railway claim subject-matter jurisdiction under the expropriation exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3), and assert eight causes of action: takings in violation of international law, aiding and abetting genocide, complicity in genocide, violations of customary international law, unlawful conversion, unjust enrichment, fraudulent misrepresentation, and accounting. The plaintiffs suing the banks claim subject-matter jurisdiction over the national bank under both the expropriation exception, 28 U.S.C. § 1605(a)(3), and the waiver exception, 28 U.S.C. § 1605(a)(1) to the FSIA, and assert six causes of action: genocide, aiding and abetting genocide, bailment, conversion, constructive

---

[1] *Abelesz v. OTP Bank*, ___ F.3d ___ (7th Cir. 2012); *Abelesz v. Erste Group Bank AG*, ___ F.3d ___ (7th Cir. 2012).

trust, and accounting. Both sets of plaintiffs seek to have their respective cases certified as class actions — the railway plaintiffs seek to have the national railway be held responsible for damages of approximately $1.25 billion, and the bank plaintiffs seek to have the national bank held jointly and severally responsible with the private bank defendants for damages of approximately $75 billion. The district court denied both the national bank's and the national railway's respective motions to dismiss.

We conclude that we have appellate jurisdiction over both of these appeals under the collateral order doctrine. We remand the cases to the district court with instructions that both sets of plaintiffs either exhaust any available Hungarian remedies identified by the national bank and national railway or present to the district court a legally compelling reason for their failure to do so. We further direct the district court to allow jurisdictional discovery with respect to whether the national railway is engaged in "commercial activity" in the United States, as required by the expropriation exception to the FSIA.

## I.  *Appellate Jurisdiction*

We turn first to our jurisdiction over these appeals. The appellate jurisdiction story in all of the interlocutory appeals arising from the bank case begins with the national bank, which moved to dismiss for lack of subject-matter jurisdiction based on a defense of sovereign immunity under the FSIA, 28 U.S.C. § 1604. The district

court denied the national bank's motion. Along the same lines, in the railway case, the national railway also moved to dismiss for lack of subject-matter jurisdiction based on a defense of sovereign immunity under the FSIA, 28 U.S.C. § 1604, which was likewise denied by the district court. The national bank and the national railway have appealed the district court's denials of their respective motions to dismiss.

The district court's denials of the national bank's and national railway's motions to dismiss on sovereign immunity grounds are immediately appealable collateral orders so that we have jurisdiction under 28 U.S.C. § 1291. Both the national bank and national railway argue, and we agree, that we also have appellate jurisdiction over their treaty-based defenses because those are part of their immunity defenses under the FSIA. We decline, however, to exercise pendent appellate jurisdiction over the national bank's statute of limitations defense, which is not inextricably intertwined with the sovereign immunity argument.

A. *Collateral Order Doctrine*

As a general rule, the district court must issue a final judgment before an appellate court has jurisdiction to entertain an appeal under 28 U.S.C. § 1291. It is well established, however, that certain types of interlocutory orders denying immunity defenses in civil cases may be appealed immediately under the collateral order doctrine, regardless of whether the denied motion was a motion to dismiss or a motion for summary judg-

ment. *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996) ("[A]n order rejecting the defense of qualified immunity at *either* the dismissal stage *or* the summary judgment stage is a 'final' judgment subject to immediate appeal."); see also *Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985) (denial of qualified immunity based on question of law was immediately appealable); *Nixon v. Fitzgerald*, 457 U.S. 731, 742-43 (1982) (denial of former president's claim of absolute immunity was immediately appealable).

Like qualified or absolute immunity in civil rights lawsuits, sovereign immunity is an immunity from trial and the attendant burdens of litigation. Sovereign immunity reflects the comity or mutual respect that is essential in dealings between sovereign nations. See *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865 (2008); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). Based on the reasoning permitting appeals of those other immunity defenses, we and other circuits treat denials of sovereign immunity defenses as appealable collateral orders. *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 789-90, 795 (7th Cir. 2011) (appeal of discovery order that rejected FSIA immunity defense); *World Holdings, LLC v. Federal Republic of Germany*, 613 F.3d 1310, 1314 & n.6 (11th Cir. 2010) (appeal of denial of FSIA immunity in suit to enforce pre-World War II German bonds); *O'Bryan v. Holy See*, 556 F.3d 361, 372 (6th Cir. 2009) (appeal of denial of FSIA immunity in case alleging sexual abuse of children by clergy); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 532 (5th Cir. 1992)

(appeal of denial of FSIA immunity in breach of contract case); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) (appeal of denial of FSIA immunity defense in expropriation case; collecting cases from several circuits); *Rush-Presbyterian-St. Luke's Med. Center v. Hellenic Republic*, 877 F.2d 574, 576 n.2 (7th Cir. 1989) (appeal of denial of FSIA immunity based on commercial activities in United States); *Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987) (appeal of denial of FSIA immunity defense asserted in breach of contract suit).

The plaintiffs in both appeals attempt to avoid this well-established doctrine and practice by arguing that the district court's orders denying the defendants' respective motions to dismiss did not "conclusively determine" that the defendants are not entitled to sovereign immunity. The district court found that both groups of plaintiffs had alleged sufficient facts to show at the motion to dismiss stage that the expropriation exception to the FSIA applied to their claims against these defendants. See 28 U.S.C. § 1605(a)(3). The court then wrote in the bank case: "It is premature at this juncture to adjudicate [the national bank's] denial of the facts alleged." *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 807 F. Supp. 2d 689, 697 (N.D. Ill. 2011). The district court noted that the national bank may, if warranted, raise its arguments regarding the expropriation exception's nexus requirements again in a motion for summary judgment. *Id.* In denying the national bank's request for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the district court wrote:

this Court did not adjudicate [the national bank's] defense of sovereign immunity under FSIA on the merits. This court denied the motion to dismiss and indicated that the issue was not ripe for adjudication at the motion to dismiss stage because Plaintiffs in opposition to the motion to dismiss argued that the [expropriation] exception under FSIA applies in this case and presented sufficient allegations at the pleadings stage to proceed further in this action at this juncture.

The district court reiterated that view in denying the national railway's motion to dismiss:

This court is not adjudicating [the national railway's] defense of sovereign immunity under FSIA on the merits. This court is denying the motion to dismiss because the FSIA issue is not ripe for adjudication at the motion to dismiss stage. Plaintiffs have presented sufficient allegations at the pleadings stage to proceed further in this action at this juncture.

*Victims of the Hungarian Holocaust v. Hungarian State Railways*, 798 F. Supp. 2d 934, 938 (N.D. Ill. 2011).

Relying on *Khorrami v. Rolince*, 539 F.3d 782 (7th Cir. 2008), both sets of plaintiffs contend that the district court's disclaimer bars appellate jurisdiction. In *Khorrami*, the plaintiff filed a *Bivens* suit against federal agents alleging violations of his constitutional rights. The defendants moved to dismiss on grounds of qualified immunity and failure to state a claim. The district court granted the motion to dismiss for failure to state a

claim with respect to all parts of the case except for those relying on the Fifth Amendment, but explicitly declined to rule on the qualified immunity motion. The defendants filed an interlocutory appeal seeking a ruling that qualified immunity applied and that the remainder of the case in any event should have been dismissed. This court found appellate jurisdiction lacking because the district court had not yet issued an order ruling either way on the qualified immunity defense. The lack of a ruling from the district court was not the functional equivalent of a denial of the motion. 539 F.3d at 790. We noted that in that situation, "it is difficult, if not impossible, for an appellate court to intervene." *Id.* at 787.

Plaintiffs' reliance on *Khorrami* is misplaced because the district court here actually ruled on the defendants' motions to dismiss. It denied them. Although the district court said it had not adjudicated the sovereign immunity defense "on the merits," the fact remains that the district court denied the defendants' motions to dismiss. In doing so, it issued the orders that both support appellate jurisdiction in these cases and distinguish these cases from the failure to rule in *Khorrami*.

Our appellate jurisdiction based on the collateral order doctrine extends to the defendants' immunity defenses based on the Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 ("1947 Treaty"), and the Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims,

U.S.-Hungary, Mar. 6, 1973, 24 U.S.T. 522 ("1973 Agreement"). FSIA immunity is subject to existing international agreements to which the United States was a party at the time of enactment of the FSIA in 1976. 28 U.S.C. § 1604. Any conflict between a treaty and the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception. See *Moore v. United Kingdom*, 384 F.3d 1079, 1084-85 (9th Cir. 2004). The defendants' arguments based on the earlier treaties are simply a part of their overall defense of sovereign immunity that we may consider in this appeal.

B.  *Pendent Appellate Jurisdiction*

To the solid jurisdictional anchor of its sovereign immunity claim, the national bank attempts to hook on its statute of limitations defense, arguing that adjudicating the statute of limitations defense at this time will promote judicial economy. The national bank's reliance on judicial economy to justify pendent appellate jurisdiction is misplaced. The Supreme Court has rejected this justification. See *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995); see also *McCarter v. Retirement Plan for Dist. Managers of American Family Ins. Grp.*, 540 F.3d 649, 653 (7th Cir. 2008) ("*Swint* itself held that a court of appeals had erred in invoking pendent appellate jurisdiction, because 'judicial economy' is no warrant for disregarding the statutory final-decision rule."). We do not have pendent appellate jurisdiction over the national bank's statute of limitations defense.

II. *Foreign Sovereign Immunity*

The parties agree that these defendants, the national bank and national railway of Hungary, are instrumentalities of a foreign sovereign under the FSIA. See 28 U.S.C. § 1603(b). The FSIA is the exclusive basis for exercising jurisdiction over foreign sovereigns in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-36 (1989). The FSIA was enacted to clarify the confusing situation that had developed after the executive branch had shifted away from a long-standing policy of asserting sovereign immunity on behalf of friendly sovereigns under virtually any circumstances toward a more restrictive approach to immunity, one that allowed U.S. courts to exercise jurisdiction over claims against foreign sovereigns based on their commercial activities, while most courts were still adhering to the broader approach. See *Republic of Austria v. Altmann*, 541 U.S. 677, 690-91 (2004); *Verlinden*, 461 U.S. at 487-88. Under the FSIA, a foreign sovereign and its instrumentalities are immune from suit in U.S. courts unless a specific statutory exception applies. 28 U.S.C. § 1604; *Samantar v. Yousuf*, 130 S. Ct. 2278, 2285-86 (2010) (holding that an individual foreign official sued for official conduct was not a "foreign state" entitled to immunity from suit under FSIA).

The plaintiffs suing the bank argue that two FSIA exceptions provide jurisdiction over their claims: the waiver exception in § 1605(a)(1), and the expropriation exception in § 1605(a)(3) for property taken in violation of international law. The district court relied on the

expropriation exception to deny the national bank's motion to dismiss and did not reach the waiver exception. 807 F. Supp. 2d at 697-98. The plaintiffs suing the railway rely solely on the expropriation exception. When evaluating a district court's conclusions on a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, we review the district court's legal conclusions *de novo*. *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 381 (7th Cir. 2001); *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) (reviewing district court's grant of motion to dismiss based on FSIA immunity). Our review of factual matters depends on how the moving party presented those issues and whether the district court resolved disputed factual issues. If the district court resolved disputed factual issues, we review those findings for clear error, but if it did not, our review is *de novo*. *E.g.*, *Scott v. Trump Indiana, Inc.*, 337 F.3d 939, 942 (7th Cir. 2003); *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995).

A. *Waiver of Sovereign Immunity*

The plaintiffs suing the national bank claim that Hungary implicitly waived its sovereign immunity by stating in its Constitution that "the Republic of Hungary accepts the universally recognized rules and regulations of international law, and harmonizes the internal laws and statutes of the country with the obligations assumed

under international law."[2] The bank plaintiffs argue that sovereign immunity is a creature of the U.S. legal system that Hungary may not use to avoid its own embrace of international law.

This waiver argument reaches too broadly. The FSIA waiver exception in § 1605(a)(1)is construed narrowly. *Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1150 (7th Cir. 2001). In fact, "courts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without strong evidence that this is what the foreign state intended." *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985); see also *Argentine Republic*, 488 U.S. at 442-43 ("Nor do we see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States.").

---

[2] The official English translation of the Hungarian constitution reads as follows: "Hungary shall ensure harmony between international law and Hungarian law in order to fulfil its obligations under international law. Hungary shall accept the generally recognised rules of international law. Other sources of international law shall become part of the Hungarian legal system by publication in the form of legislation." The Fundamental Law of Hungary [Constitution] Apr. 25, 2011, art. Q, *available at* http://www.kormany.hu/download/2/ab/30000/Alap_angol.pdf.

*Sampson* illustrates the point well. In that case, a Holocaust survivor sued Germany for his imprisonment in Nazi concentration camps. The district court dismissed the claims against Germany based on the FSIA. Sampson argued on appeal that Germany had waived it sovereign immunity based on: (1) a letter from the German government stating that the German people are responsible for the past, (2) a letter from the Claims Conference stating that Sampson was eligible to receive compensation payments, and (3) a holding by the German constitutional court regarding the universal and mandatory norms of international law known as *jus cogens* norms.[3] We held that these statements did not indicate an intent by the state of Germany to be subject to suit in U.S. courts, but "merely demonstrate[d] that Germany recognizes that its actions during World War II constituted violations of *jus cogens* norms." 250 F.3d at 1151. Similarly here, the language of the Hungarian Constitution falls far short of expressing an intent by the Republic of Hungary to be subject to suit

---

[3] A *jus cogens* norm, also known as a peremptory norm of international law, "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992), quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679; see also *Sampson*, 250 F.3d at 1149-50.

in U.S. courts. Like the evidence offered in *Sampson*, the language of the Hungarian Constitution demonstrates Hungary's recognition and acceptance of international law norms and obligations, but is not a waiver of its sovereign immunity. Section 1605(a)(1) does not apply here.

B.  *The Expropriation Exception*

The more substantial issues here concern the scope of the expropriation exception to the FSIA. The statute provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case — in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3). To break that down, the expropriation exception defeats sovereign immunity where (1) rights in property are in issue; (2) the property was taken; (3) the taking was in violation of international law; and (4) at least one of the two nexus requirements is satisfied. See

*Zappia Middle East Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (laying out four elements of FSIA expropriation exception). The district court found that the plaintiffs' allegations in both cases were sufficient to rely on the expropriation exception. 807 F. Supp. 2d at 697-98 (bank case); 798 F. Supp. 2d at 938 (railway case). On appeal, the national bank argues that the plaintiffs' allegations fail on each element of the expropriation exception. The national railway argues that the plaintiffs' allegations fail on the "in violation of international law" element and the nexus element. We conclude that the plaintiffs suing the bank have alleged several elements of the expropriation exception but have not sufficiently alleged a violation of international law because they have not exhausted the Hungarian remedies available to them or provided a legally compelling explanation for their failure to do so. With respect to the plaintiffs suing the railway, we conclude both that they have not sufficiently alleged a violation of international law because of their failure to exhaust and that they have not sufficiently alleged that the national railway is engaged in commercial activity in the United States, as required by the nexus element of the expropriation exception.

1. *Rights in Property*

The named plaintiffs in the bank case allege the expropriation of bank accounts and, in one case, a home. The national bank argues that plaintiffs' claims based on expropriation of bank accounts are not covered by the expropriation exception. We reject the national bank's

arguments on this score, which are built on the faulty premise that the expropriation exception can apply only to a claim by an owner of tangible property.[4]

The national bank's argument finds some support in district court opinions that have held that the "rights in property" element of the expropriation exception is limited to claims for tangible property. See, *e.g.*, *Gutch v. Federal Republic of Germany*, 444 F. Supp. 2d 1, 10 (D.D.C. 2006) ("Most courts maintain that the expropriation exception applies only when the property at issue is 'tangible.'"), *aff'd mem. on other grounds*, 255 F. App'x 524 (D.C. Cir. 2007); *Sampson v. Federal Republic of Germany*,

---

[4] One plaintiff-appellee with claims against the national bank, Paul Fischer, has voluntarily dismissed his claims against the national bank and its co-defendant, Erste Group Bank. The national bank urges that Fischer's dismissal strengthens its appeal because he was "the only plaintiff-appellee whose relatives are alleged to have had tangible assets — as opposed to intangible bank accounts — at [the national bank]." Fischer's departure does not affect our analysis of the "rights in property at issue" because we follow the D.C. Circuit in determining that the expropriation exception applies to both tangible and intangible property. In any event, Mr. Fischer was not the only plaintiff to allege the taking of tangible property by the national bank. Plaintiff Istvan Somogyi alleges that his grandparents' home in Budapest was expropriated by the national bank. Compl. ¶ 19. Also, plaintiffs seek to hold the defendant banks jointly and severally liable, and several plaintiffs with claims against the other defendant banks allege the taking of tangible property, including gold and jewelry.

975 F. Supp. 1108, 1117 (N.D. Ill. 1997) ("property" under expropriation exception refers to tangible property), *aff'd on other grounds*, 250 F.3d 1145 (7th Cir. 2001); *Hirsh v. State of Israel*, 962 F. Supp. 377, 383 (S.D.N.Y. 1997) (expropriation exception applies only to the expropriation of tangible property, not to a right to receive payments), *aff'd mem.*, 133 F.3d 907 (2d Cir. 1997).

The D.C. Circuit reached the opposite conclusion, finding no reason to distinguish between tangible and intangible property for purposes of the FSIA's expropriation exception to immunity. In *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470 (D.C. Cir. 2007), plaintiffs of Eritrean origin or nationality filed a proposed class action suit under the FSIA against Ethiopia claiming unlawful takings of bank accounts and other property. *Id.* at 472-73. The district court had dismissed the complaint for lack of subject-matter jurisdiction, finding that a taking of intangible property like a bank account is not covered by the expropriation exception. The D.C. Circuit ultimately affirmed the dismissal on other grounds (discussed below) but rejected the district court's exclusion of intangible property from "rights in property" under the expropriation exception. 491 F.3d at 475-80. The court noted that the tangible/intangible distinction seemed to have been based on a comment in a House committee report that the expropriation exception was "in no way [to] affect[] existing law on the extent to which, if at all, the 'act of state' doctrine may be applicable." H.R. Rep. No. 94-1487, at 20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1604, 1618. This comment was interpreted as requiring that the types of property subject to the expropriation exception parallel

the types of property permitted under the act of state doctrine. See *Canadian Overseas Ores Ltd. v. Compania de Acero Del Pacifico S.A.*, 528 F. Supp. 1337, 1346 (S.D.N.Y. 1982), *aff'd on other grounds*, 727 F.2d 274 (2d Cir. 1984).

Rejecting this reasoning, the D.C. Circuit pointed out that the statutory language of the expropriation exception did not support any distinction between tangible and intangible property. 491 F.3d at 478. The D.C. Circuit also dissected the legislative history and concluded that "'the tangible/intangible characterization of property interests . . . is a distinction without a difference' and 'is not generally recognized in international, federal, or state law.'" 491 F.3d at 478 (alteration in original), quoting *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 830 (9th Cir. 1987) (rejecting tangible/intangible distinction under act of state doctrine). The D.C. Circuit therefore concluded that the expropriation exception could apply to claims for the expropriation of the appellants' bank accounts, 491 F.3d at 480, though the court later found that the claims were properly dismissed for failure to meet the "owned or operated" prong of the nexus requirement, which we discuss below. Without retracing the details of the argument, suffice it to say that on this issue, we agree with the D.C. Circuit in *Nemariam* and hold that the "rights in property" element of the FSIA's expropriation exception applies to both tangible and intangible property.[5]

---

[5] The D.C. Circuit appears to be the only circuit that has decided this issue. The Second Circuit explicitly declined to

(continued...)

2. *"Taken"*

The national bank argues next that even if we agree with *Nemariam* that rights in intangible property are "rights in property" under the expropriation exception, plaintiffs' claims fail because the D.C. Circuit found that the bank account proceeds in that case were not "taken" within the meaning of the FSIA. The argument misreads *Nemariam*. The D.C. Circuit held that the defendant bank in that case did not "own or operate" the allegedly expropriated property, 491 F.3d at 481, and never discussed whether the property was "taken" within the meaning of the expropriation exception. The term "taken" is intended to distinguish between the acts of a sovereign and the acts of a private enterprise. See *Zappia Middle East Const. Co.*, 215 F.3d at 251 ("The term 'taken' thus clearly refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property without adequate compensation."). The parties agree that the

---

[5] (...continued)

decide the issue in *Zappia Middle East Const. Co.,* 215 F.3d at 251, and the Eighth Circuit noted but did not decide it in *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir. 1989). In cases where victorious plaintiffs have sought to attach property of foreign states in the United States, see 28 U.S.C. § 1610, other circuits have assumed that sovereign "property" that can be attached includes intangible property, such as a right to payment. See *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131 (9th Cir. 2010); *FG Hemisphere Assocs., LLC v. République du Congo*, 455 F.3d 575, 588-90 (5th Cir. 2006); *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 251 (5th Cir. 2002).

national bank is an instrumentality of Hungary under the FSIA. Any property expropriated by the national bank would qualify as "taken" and could be subject to the expropriation exception.

### 3. *Violation of International Law*

The next element of the expropriation exception requires a plaintiff first to allege and ultimately to prove that the expropriation of property was a violation of international law. This element provides the most important and complex problems for us. The national bank advances four arguments as to why the alleged takings could not have violated international law, two of which are also pressed by the national railway. First, both defendants argue that expropriations of property from Hungarian nationals by Hungarian authorities were "domestic takings" that could not violate international law. Second, the national bank argues that U.S. law preempts genocide claims based on customary international law. Third, both defendants argue that the alleged takings were not violations of international law because plaintiffs failed to exhaust available remedies in Hungary. Fourth, the national bank argues that no actionable rights exist under the treaties, charters, or conventions cited in the complaint. We consider these arguments in turn.

### a. *Domestic Takings*

Plaintiffs allege that the national bank and national railway, instruments of the Hungarian sovereign, expropriated assets from Hungarian nationals pursuant to official decrees, legislation, and actions mandated by the then Hungarian government. Defendants both argue that during World War II, customary international law universally recognized that a sovereign could expropriate the property of its own nationals within its own territory without violating international law.

This rule of international law, that a so-called "domestic taking" cannot violate international law, has been recognized and applied in many decisions in U.S. courts. See, *e.g.*, *United States v. Belmont*, 301 U.S. 324, 332 (1937) (enforcing international agreement by which United States effectively ratified Soviet Union's expropriation of Russian corporation's property: "What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled."); *Dreyfus v. Von Finck*, 534 F.2d 24, 31 (2d Cir. 1976) ("violations of international law do not occur when the aggrieved parties are nationals of the acting state"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."), quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990); *FOGADE v. ENB Revocable Trust*,

263 F.3d 1274, 1294 (11th Cir. 2001) ("As a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law."); *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1397 (5th Cir. 1985) ("At present, the taking by a state of its national's property does not contravene the international law of minimum human rights."); *Jafari v. Islamic Republic of Iran*, 539 F. Supp. 209, 215 (N.D. Ill. 1982) ("Similarly, the 'law of nations' does not prohibit a government's expropriation of the property of its own nationals."); *Wahba v. National Bank of Egypt*, 457 F. Supp. 2d 721, 731 (E.D. Tex. 2006) ("The expropriation exception does not apply, however, to a foreign state's dealings with property owned by its own nationals."); see also Restatement (Third) of Foreign Relations Law § 712(1) (1987) (a state is responsible under international law for injury resulting from "a taking by the state of the property *of a national of another state*" if taking is not for public purpose, is discriminatory, or is not accompanied by provision for just compensation) (emphasis added). Defendants argue that such "domestic takings" were not a violation of international law in 1944 or today and therefore cannot support a claim under the expropriation exception to FSIA immunity.

If we were dealing with claims of *only* expropriation of property, as was true in almost all of the cited cases, we would agree and would apply the domestic takings exception here. For example, in *Chuidian*, U.S. courts applied the domestic takings rule and found no violation of international law when officials of the new Aquino government in the Philippines instructed a U.S. bank to

dishonor a letter of credit that had been issued in favor
of a close associate of former president Marcos. 912 F.2d
at 1105, *abrogated on other grounds by Samantar v. Yousuf*,
130 S. Ct. 2278 (2001). In *de Sanchez*, the domestic takings
rule applied when a new Nicaraguan government
placed a stop-payment order on a check issued by the
national bank to the wife of a minister in the former
government. 770 F.2d at 1395. In *FOGADE*, the domestic
takings rule applied when the Venezuelan government
placed a Venezuelan corporation in something akin to
a receivership. 263 F.3d at 1294. In *Wahba*, the domestic
takings rule applied when the national bank of Egypt
seized the assets of Egyptian citizens who were
business partners with government enterprises to
retaliate against speculation in cotton markets that
harmed Egyptian interests. 457 F. Supp. 2d at 731. In
*Jafari*, the domestic takings rule applied to claims that a
new Iranian government had expropriated real estate,
pensions, and other property from several Iranian citi-
zens. 539 F. Supp. at 215 ("It may be foreign to our way
of life and thought, but the fact is that governmental
expropriation is not so universally abhorred that its
prohibition commands the 'general assent of civilized
nations' — a prerequisite to incorporation in the 'law
of nations.'") (citation omitted).

We do not question these cases applying the domestic
takings rule, which recognizes that views among
nations about private property rights and the role of
government differ, as Judge Shadur noted in *Jafari*.
Actions that might appear to one regime or nation as

unfair expropriations might seem to another to be a just remedy for decades or more of exploitation of the poor and downtrodden.

We are convinced, though, that the plaintiffs' allegations about the relationship between genocide and expropriation in the Hungarian Holocaust take these cases outside the domestic takings rule and its foundations. Genocide, the complaints here clearly imply, can be an expensive proposition. Expropriating property from the targets of genocide has the ghoulishly efficient result of both paying for the costs associated with a systematic attempt to murder an entire people and leaving destitute any who manage to survive. The expropriations alleged by plaintiffs in these cases — the freezing of bank accounts, the straw-man control of corporations, the looting of safe deposit boxes and suitcases brought by Jews to the train stations, and even charging third-class train fares to victims being sent to death camps — should be viewed, at least on the pleadings, as an integral part of the genocidal plan to depopulate Hungary of its Jews. The expropriations thus effectuated genocide in two ways. They funded the transport and murder of Hungarian Jews, and they impoverished those who survived, depriving them of the financial means to reconstitute their lives and former communities.

All U.S. courts to consider the issue recognize genocide as a violation of customary international law. See, *e.g.*, *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 759 (9th Cir. 2011) ("Claims of genocide, therefore, fall within the limited category of claims constituting a violation

of internationally accepted norms for [Alien Tort Statute] jurisdiction."), *petition for cert. filed*, 80 U.S.L.W. 3335 (U.S. Nov. 23, 2011) (No. 11-649); *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 244 n.18 (2d Cir. 2003) ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Kadic v. Karadžić*, 70 F.3d 232, 241 (2d Cir. 1995) ("In the aftermath of the atrocities committed during the Second World War, the condemnation of genocide as contrary to international law quickly achieved broad acceptance by the community of nations."); *Siderman de Blake*, 965 F.2d at 715 ("The universal and fundamental rights of human beings identified by Nuremberg — rights against genocide, enslavement, and other inhumane acts — are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*.") (internal citation omitted); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, summary execution, genocide and slavery.") (citations omitted); *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 371 (E.D. La. 1997) ("Genocide, for example, violates international law, whether undertaken by a state or nonstate actor."), *aff'd on other grounds,* 197 F.3d 161 (5th Cir. 1999); *Handel v. Artukovic*, 601 F. Supp. 1421, 1428 (C.D. Cal. 1985) ("It appears clear that the acts of genocide, torture, enslavement, and religious discrimination alleged in plaintiffs'

complaint constituted violations of the laws of humanity at the time they were committed."); see also *Sosa v. Alvarez-Machain*, 542 U.S. 692, 762 (2004) (Breyer, J., concurring in part and concurring in the judgment) ("Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior. That subset includes torture, genocide, crimes against humanity, and war crimes.") (internal citation omitted); Restatement (Third) of Foreign Relations Law of the United States § 702 (recognizing genocide as a violation of international law).

Genocide also has been criminalized by the international criminal tribunals. See Rome Statute of the International Criminal Court, arts. 5-6; Statute of the International Criminal Tribunal for the former Yugoslavia, art. 4; Statute of the International Criminal Tribunal for Rwanda, art. 2. Genocide has been recognized as a *jus cogens* norm. As we noted in *Sampson*, *jus cogens* norms supported the prosecutions in the Nuremberg trials. 250 F.3d at 1150; see also *Siderman de Blake*, 965 F.2d at 715 ("The universal and fundamental rights of human beings identified by Nuremberg — rights against genocide, enslavement, and other inhumane acts — are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*.") (internal citation omitted).

On this general point, the "general assent of civilized nations" is well established. The international norm against genocide is specific, universal, and obligatory.

Where international law universally condemns the ends, we do not believe the domestic takings rule can be used to require courts to turn a blind eye to the means used to carry out those ends — in this case, widespread expropriation of victims' property to fund and accomplish the genocide itself. Plaintiffs' allegations of these expropriations as an integral party of the overall genocidal plan allege violations of international law notwithstanding the domestic takings rule that would apply in most other circumstances.[6]

Defendants protest that plaintiffs cannot convert what defendants characterize as "non-actionable domestic takings" claims into genocide-based claims. Such claims, as converted, could proceed, if at all, argues the

---

[6] We are not persuaded by plaintiffs' argument that the domestic takings rule operates to bar the claims of only citizens and thus should not apply in this case on the theory that plaintiffs were not citizens of Hungary "in any meaningful sense" at the time of expropriation. Most courts agree that the relevant inquiry for purposes of the domestic takings rule is whether plaintiffs are *nationals* of the expropriating state. See *Belmont*, 301 U.S. at 332; *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 442 (1964) (White, J., dissenting)*; Dreyfus*, 534 F.2d at 31; *Siderman de Blake*, 965 F.2d at 711; *Chuidian*, 912 F.2d at 1105; *FOGADE*, 263 F.3d at 1294; *de Sanchez,* 770 F.2d at 1397; *Jafari*, 539 F. Supp. at 215; *Wahba*, 457 F. Supp. at 731; see also Restatement (Third) of Foreign Relations Law § 712(1) (1987). But see *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 129-31 (D.D.C. 2011) (adopting distinction in Holocaust case); *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1165-66 (C.D. Cal. 2006) (same), *aff'd in part*, 616 F.3d at 1023 n.2.

national bank, only under the FSIA's non-commercial tort exception for claims for personal injury or death, but that exception cannot apply in these cases because it applies only if the offending conduct occurred in the United States. 28 U.S.C. § 1605(a)(5). We agree with the national bank that plaintiffs cannot bring claims for personal injury or death under the expropriation exception. Plaintiffs' claims, however, are not for personal injury or death. They are for property expropriated pursuant to and as an integral part of a widespread campaign to deprive Hungarian Jews of their wealth and to fund genocide, a long-recognized violation of international law. We acknowledge that the fact that plaintiffs can seek compensation for taken property but not for taken lives seems anomalous. That anomaly, however, is the product of the statutory limits of the FSIA. The limits on remedies available in U.S. courts do not indicate a deficiency in their claims under substantive international law. Jurisdiction over plaintiffs' claims is not barred by the domestic takings rule.[7]

---

[7] Two of the cited cases applying the domestic takings rule are closer to our case because they alleged expropriation motivated by religious hatred. We believe both cases are distinguishable from the plaintiffs' allegations of expropriations to fund genocide in these cases. In *Dreyfus*, the Second Circuit applied the domestic takings rule to dismiss a German Jew's claims against German citizens to whom he sold his business under Nazi compulsion and duress in 1938 as he was forced to leave Germany. 534 F.2d at 31. *Siderman*

(continued...)

b. *Federal Preemption*

The national bank next argues that federal law preempts genocide claims based on customary international law. Here, the national bank argues, we may not recognize plaintiffs' claims of genocide by expropriation because the Genocide Convention Implementation Act of 1987 (the "Proxmire Act"), 18 U.S.C. §§ 1091-93, established a federal statutory framework that precludes such claims by: (1) defining genocide with a list of acts that does not include theft or looting of assets among the culpable activities; and (2) more important to the national bank, expressly disavowing private civil claims.

As a general rule, customary international law is not applicable in U.S. courts where a controlling federal

---

[7] (...continued)

*de Blake* applied the rule to affirm dismissal of claims by Argentine Jews against the Argentine military government for expropriation of property, along with torture and other wrongs motivated by religious hatred, but the court held that a U.S. citizen could pursue an expropriation claim. 965 F.2d at 711. In terms of international law, even these examples of expropriation motivated by religious hatred fall well short of the genocide alleged here. Dreyfus was forced to leave Germany, but he was not sent to a death camp. The abominable torture in *Siderman de Blake* was surely horrific for the individuals involved but simply was not on a scale comparable to the Holocaust, nor was it financed by the expropriation of the victim's property. The case did not present the integral relationship between expropriation and genocide that is alleged here.

statute prescribes different standards. *Bradvica v. I.N.S.*, 128 F.3d 1009, 1014 n.5 (7th Cir. 1997); *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988). For example, in *Enahoro v. Abubakar*, Nigerian nationals pled their claims of torture and killing by a former Nigerian head of state as a common law violation of the law of nations under the Alien Tort Statute. 408 F.3d 877 (7th Cir. 2005). The defendant argued that because the plaintiffs had not complied with the exhaustion requirement in the Torture Victim Protection Act, their case should be dismissed. *Id.* at 884. The district court rejected this argument because plaintiffs had pled their case under the Alien Tort Statute and not the Torture Victim Protection Act. The district court found they had no reason to comply with the requirements of the latter act. *Id.* We rejected this argument, finding that the Torture Victim Protection Act "occup[ied] the field" such that plaintiffs could not choose to file their torture and extrajudicial killing claims under the Alien Tort Statute when they would have been properly pled under the Torture Victim Protection Act. *Id.* at 884-85.

That is not the case here, however. As the national bank itself repeatedly emphasizes, the claims in the bank case stem from the alleged expropriation of personal property from Hungarian nationals by the Hungarian national bank. The jurisdiction of the Proxmire Act, the statute that the national bank claims preempts the bank plaintiffs' claims, is explicitly limited to genocide committed either in whole or in part within the United States or, regardless of where the offense is committed,

to cases where the alleged offender is a U.S. national, a lawful permanent U.S. resident, a stateless person residing in the United States, or present in the United States. 18 U.S.C. § 1091; see also *Sampson*, 975 F. Supp. at 1119-20. Because the bank plaintiffs' claims clearly do not fall within the scope of the Proxmire Act, that statute does not preempt their claims under customary international law.

### c. *Exhaustion of Domestic Remedies*

Defendants next argue that the alleged expropriation cannot be considered a violation of international law because plaintiffs have not alleged that they have pursued and exhausted domestic remedies in Hungary, the foreign state that is alleged to have caused the injury. This argument presents two separate questions: first, whether the FSIA itself imposes a statutory exhaustion requirement, and second, whether international law requires exhaustion of domestic remedies before plaintiffs can establish a violation.

On the statutory exhaustion point, nothing in § 1605(a)(3) suggests that plaintiffs must exhaust domestic Hungarian remedies before bringing suit in the United States. It does not, for example, condition the exception to immunity on a claimant's having first presented his claim to the courts of the country being sued or to an international tribunal. Defendants have identified no language in the FSIA and no case law indicating that the FSIA contains a statutory exhaustion requirement. The Ninth Circuit and the D.C. Circuit have both held that it does not. See

*Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1034-37 (9th Cir. 2010); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948-49 (D.C. Cir. 2008). We agree with the Ninth and D.C. Circuits that the FSIA does not contain a statutory exhaustion requirement.[8]

Whether a plaintiff must exhaust domestic remedies to assert a claim for expropriation in violation of international law is a different question. Defendants argue that plaintiffs cannot complain that a "taking" has not been fairly compensated (and hence violates international law) unless they first pursue and exhaust any available Hungarian remedies, or at least provide a legally compelling explanation for why they have not done so. Noting that "Hungary is a well-established European state, with a well functioning legal system that operates under established and cognizable rules of law," the national bank offers a 1992 statute as an example of "the variety of laws that Hungary has enacted to provide compensation to individuals in [plaintiffs'] position." Plaintiffs respond by arguing that domestic exhaustion is not required by international law. In the alternative, they argue that even if exhaustion is required generally, it

---

[8] The FSIA previously contained one exception with a local exhaustion requirement, § 1605(a)(7), which for certain suits required that the foreign state be granted "a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration." Congress repealed that exception in 2008. See National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, div. A, § 1083(b)(1)(A)(iii), 122 Stat. 3, 341 (2008).

should not be required in these cases because both sets of plaintiffs have satisfactorily explained their failure to do so.

The international law issue therefore breaks down into two distinct questions. One, does international law require plaintiffs to exhaust domestic remedies before pursuing expropriation claims elsewhere? Two, if exhaustion is required, have plaintiffs exhausted domestic remedies or, in the alternative, have they provided a legally compelling reason for their failure to do so?

On the first question, the Supreme Court has suggested that exhaustion of domestic remedies may well be necessary to assert a violation of customary international law, but the Court has not answered the question definitively. In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), the Court noted that it "would certainly consider" whether claimants must have exhausted domestic or international remedies before asserting a claim in a foreign forum "in an appropriate case." In another claim involving property expropriated during the Holocaust, Justice Breyer wrote that "a plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking." *Altmann*, 541 U.S. at 714 (Breyer, J., concurring). We have likewise noted that "[i]t may be that a requirement for exhaustion is itself a basic principle of international law." *Enahoro*, 408 F.3d at 886.

In fact, the requirement that domestic remedies for expropriation be exhausted before international proceedings may be instituted is "a well-established rule

of customary international law" that the United States itself has invoked. *Interhandel* (Switz. v. U.S.), Preliminary Objections, 1959 I.C.J. 6, 26-27 (Mar. 21) (upholding the United States' Third Preliminary Objection that the Court had no jurisdiction to hear or determine the matters raised by the Swiss Application and Memorial because Interhandel, whose case Switzerland was pressing, had not exhausted the local remedies available to it in U.S. courts); see also American Convention on Human Rights, art. 46, Nov. 22, 1969, 1144 U.N.T.S. 123 ("Admission by the Commission of a petition or communication lodged in accordance with Articles 44 or 45 shall be subject to the following requirements: That the remedies under domestic law have been pursued and exhausted in accordance with generally recognized principles of international law . . . ."); Convention for the Protection of Human Rights and Fundamental Freedoms, art. 26, Nov. 4, 1950, 213 U.N.T.S. 221 ("The Commission may only deal with the matter after all domestic remedies have been exhausted, according to the generally recognised rules of international law, and within a period of six months from the date on which the final decision was taken."); *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998); *Greenpeace, Inc. (USA) v. State of France*, 946 F. Supp. 773, 783 (C.D. Cal. 1996); Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies . . . [listing exceptions.]"); Ian Brownlie, Princi-

ples of Public International Law 492-501 (7th ed. 2008).[9] This rule is based on the idea that the state where the alleged violation occurred should have an opportunity to redress it by its own means, within the framework of its own legal system. *Interhandel*, 1959 I.C.J. at 26-27; see also Brownlie at 492-93 (listing other practical and political considerations justifying the domestic exhaustion rule).

The *Interhandel* case is helpful for two reasons. First, it lays out the sovereignty and comity concerns underlying the domestic exhaustion rule. Second, it is a case in which the United States requested that an international court refrain from adjudicating a claim because the plaintiffs had not exhausted available U.S. remedies. Comity requires that the United States be prepared to reciprocate. In *Interhandel*, Switzerland filed with the International Court of Justice an application for interim measures of protection against the United States. In 1942, the U.S. government seized a Swiss sub-

---

[9] The Ninth Circuit rejected *Millicom*, *Greenpeace*, and the Restatement as support for the proposition that the FSIA imposes a statutory exhaustion requirement, but declined to consider whether prudential exhaustion could be invoked to affect when a decision on the merits may be made. *Cassirer*, 616 F.3d at 1037. The D.C. Circuit rejected a similar exhaustion argument based on the Restatement, but ultimately decided the issue based on the fact that, even if exhaustion were required, the remedy identified by the defendant was on its face inadequate. *Agudas Chasidei Chabad of U.S.*, 528 F.3d at 949.

sidiary of Interhandel as enemy property under the Trading with the Enemy Act. The United States contended that the subsidiary was owned by or held for the benefit of a German company and thus was substantially under the control of an enemy corporation. See K.R. Simmonds, *The Interhandel Case*, 10 Int'l & Comp. L. Q. 495, 496 (1961). Relying upon the provisions of the Trading with the Enemy Act, Interhandel sought relief in the U.S. District Court for the District of Columbia. The suit bounced around the federal courts for years, and litigation was proceeding before the U.S. Supreme Court when the Swiss application and the United States' Preliminary Objections were submitted to the International Court of Justice. *Id.* at 501. The United States' Third Preliminary Objection sought a finding that the International Court of Justice did not have jurisdiction over the Swiss application because Interhandel had not exhausted the local remedies available to it in the U.S. courts. *Interhandel*, 1959 I.C.J. at 26.

In finding that it lacked jurisdiction due to Interhandel's failure to exhaust available U.S. remedies, the International Court of Justice noted that the domestic exhaustion rule is well established in customary international law, generally being observed in cases where a state has adopted the cause of its national who claims another state violated his rights in violation of international law. *Id.* at 26-27. The International Court of Justice further found that the domestic exhaustion rule applied with equal force when domestic proceedings were pending and the domestic and international proceedings were designed to obtain the same result. *Id.* at 27.

In *Millicom*, three corporate entities brought suit in the United States against the Republic of Costa Rica, a Costa Rican instrumentality, and a subsidiary of the Costa Rican instrumentality. The suit alleged unlawful anti-competitive activity and other related misconduct in the Costa Rican cellular services market. 995 F. Supp. at 15. Citing *Greenpeace* (which in turn cited *Interhandel*), the district court noted: "As a threshold matter, a claimant cannot complain that a 'taking' or other economic injury has not been fairly compensated, and hence violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Id.* at 23. The court then explained that none of the exceptions recognized in the Restatement applied. *Id.* Plaintiffs attempt to distinguish *Millicom* by arguing that case requires plaintiffs to show domestic exhaustion only where efforts to recover "taken" assets are contemporaneous with the taking itself. The district court in *Millicom* did not, however, indicate that the timing of the plaintiffs' complaint affected its reasoning. Rather, the *Millicom* court's citation to *Interhandel* seems to indicate that its reasoning was predicated on the comity and reciprocity concerns underpinning the domestic exhaustion rule. Moreover, it would be an odd rule of law if a plaintiff could avoid an exhaustion requirement by simply waiting long enough to bring the claim.

As Justice Breyer noted in his concurrence in *Altmann*, U.S. constitutional law requires a claimant to exhaust available post-deprivation remedies before a state or local government's taking of property can be deemed a

federal constitutional violation. 541 U.S. at 714 (Breyer, J., concurring), citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999), and *Kirby Forest Indus., Inc. v. U.S.*, 467 U.S. 1, 10 (1984). "A federal court, moreover, cannot entertain a takings claim under § 1983 unless or until the complaining land-owner has been denied an adequate postdeprivation remedy." *City of Monterey*, 526 U.S. at 721.

These claims of takings of property in violation of international law are similar enough to expect claimants in these plaintiffs' situations either to pursue and exhaust domestic remedies in Hungary or to show convincingly that such remedies are clearly a sham or inadequate or that their application is unreasonably prolonged. See Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f. We hope we are not misunderstood. We do not mean to suggest that Hungary had in place meaningful remedies at the time of the Holocaust or during more than 40 years of Communist government after the war. But plaintiffs are pursuing their claims *now*, more than 65 years after the expropriations took place and after Hungary has had more than 20 years of government not dominated by the Soviet Union. Now is the relevant time for evaluating the adequacy of domestic remedies.[10]

---

[10] In *Flomo*, an Alien Tort Statute case brought against private defendants, we rejected a rigid exhaustion requirement but recognized that a U.S. court might need to stay a case to

(continued...)

As we consider this exhaustion issue, we cannot overlook the comity and reciprocity between sovereign nations that dominate international law. The plaintiffs suing the railway seek a judgment from a U.S. court ordering the national railway to pay plaintiffs as much a $1.25 billion. The plaintiffs suing the bank seek as much as $75 billion. The sum of damages sought by plaintiffs would amount to nearly 40 percent of Hungary's annual gross domestic product in 2011. Divided among Hungary's current population of 10 million people, that is more than $7500 per person. We should consider how the United States would react if a foreign court ordered the U.S. Treasury or the Federal Reserve Bank to pay a group of plaintiffs 40 percent of U.S. annual gross domestic product, which would be roughly $6 trillion, or $20,000 for every resident in the United States. And consider further the reaction if such an order were based on events that

---

[10] (...continued)

allow for exhaustion as a matter of comity: "The first [argument we reject] is that plaintiffs must exhaust their legal remedies in the nation in which the alleged violation of customary international law occurred. The implications of this argument border on the ridiculous; imagine having been required to file suit in a court in Nazi Germany complaining about genocide before being able to sue under the Alien Tort Statute. What is true is that a U.S. court might, as a matter of international comity, stay an Alien Tort suit that had been filed in the U.S. court, in order to give the courts of the nation in which the violation had occurred a chance to remedy it, provided that the nation seemed willing and able to do that." *Flomo*, 643 F.3d at 1025.

happened generations ago in the United States itself, without any effort to secure just compensation through U.S. courts. If U.S. courts are ready to exercise jurisdiction to right wrongs all over the world, including those of past generations, we should not complain if other countries' courts decide to do the same.

Hungary, a modern republic and member of the European Union, deserves a chance to address these claims. That is not to say that U.S. courts have no place in this sort of case. If plaintiffs choose to pursue their claims in Hungary but find the way barred by inaction or hostility, the U.S. courts may be available to consider their claims. But Hungary should first have the opportunity to address these alleged takings, by its own means and under its own legal system, before a U.S. court steps in to resolve claims against a part of the Hungarian national government for these actions taken in Hungary so long ago.[11]

We now turn to whether there is a legally compelling reason for plaintiffs' failure to exhaust Hungarian remedies, such that the domestic exhaustion rule should not bar their claims. Plaintiffs advance three arguments on this point. First, plaintiffs argue that defendants' denial of their factual allegations means that Hungary denies responsibility for their claims. Next, plaintiffs argue

---

[11] Plaintiffs have advised us that Hungary has amended its constitution to declare that there are no statutes of limitations on crimes visited upon the Hungarian people during World War II.

that any potential remedies in Hungary are inadequate, pointing out that the Constitutional Court of Hungary ruled in 1993 that Hungary had never fully complied with its obligation to make reparations under the 1973 Agreement. Last, they argue that any Hungarian remedy that might exist now has been unreasonably prolonged, as most of the claimants are surviving family members and Hungary still has not moved to compensate these plaintiffs or to set up procedures for such compensation. These arguments are based on the Restatement (Third) of the Foreign Relations Law of the United States § 713, comment f, which addresses state-to-state claims, where a state brings a claim on behalf of its own nationals.[12]

These arguments are not persuasive. Plaintiffs cite defendants' decisions to defend themselves against this litigation as evidence that Hungary as a sovereign is denying responsibility for plaintiffs' claims. The argument proves too much, for it would excuse use of domestic remedies in any case that is actually contested. Switzerland raised the same objection in *Interhandel*,

---

[12] Section 713 is written in terms of one state's claim on behalf of its nationals against another state. We believe the exceptions in comment f to § 713 should guide this inquiry into the adequacy of domestic remedies. Plaintiffs in these cases ultimately seek judgments from a U.S. court that the U.S. government would try to enforce against arms of the Hungarian government. The exceptions in comment f are where domestic remedies "are clearly sham or inadequate, or their application is unreasonably prolonged," or if the respondent state "firmly denies responsibility."

arguing that the domestic exhaustion rule did not apply because it was the U.S. government, as opposed to a subsidiary, that had taken the action against Interhandel. The International Court of Justice rejected the argument, attaching "decisive importance" to the fact that the law of the United States made available adequate remedies for the defense of the rights that Interhandel felt had been violated. 1959 I.C.J. at 27. We agree. Defendants' decisions to defend themselves rather than to settle or concede is not tantamount to a decision by Hungary, in its sovereign capacity, to deny plaintiffs' claims. Plaintiffs cite no legislation, executive statement, or case law indicating that the Hungarian government denies these events or would refuse to entertain claims for losses related to the Holocaust. If U.S. courts implementing procedures established by U.S. law can provide adequate remedies against the U.S. government itself, comity suggests that other nations are entitled to similar opportunities to address claims against their agencies.

Nor does the Constitutional Court's 1993 ruling convince us that there is or was no adequate remedy available to plaintiffs in Hungary. Nearly 20 years have passed since that ruling. In that time Hungary has adopted a new constitution and become a member of both the European Union and NATO. Its legal system operates under established rules of law. The fact that the Constitutional Court was able and willing to rule that Hungary never fully complied with its obligations to make reparations under the 1973 Agreement suggests that Hungary has a functional and independent judiciary. These facts all point to Hungary's apparent ability to

provide an adequate remedy to plaintiffs, whether under a statute specifically enacted to remedy Holocaust-era injuries or under a general takings statute.

As for plaintiffs' argument that any presently available remedy was unreasonably prolonged, we must recall that plaintiffs themselves waited until 2010 to file their complaints in the United States. The German Foundation and the Austrian General Settlement Fund, two international settlements created for the benefit of Holocaust victims, were finalized in 2000 and 2001, respectively. Whether Hungary's 1992 compensation statute is, as plaintiffs claim, inadequate is a separate question from whether it was unreasonably prolonged. For purposes of this case, we think it was not unreasonably prolonged. It was enacted nearly a decade before the German Foundation or the Austrian General Settlement Fund were created, and almost 20 years before plaintiffs filed the complaints in these cases. Plaintiffs have not shown that any presently available remedy was unreasonably prolonged.

In short, there is no reason for U.S. courts to take up these claims without a persuasive showing that Hungarian law is unresponsive. We acknowledge, however, that plaintiffs offer some powerful emotional reasons against requiring exhaustion of domestic remedies. As survivors of the effort of an earlier Hungarian government to exterminate them or their loved ones, plaintiffs have an understandable fear and reluctance to trust a Hungarian forum to try their claims fairly. Because of resurgent anti-Semitism and violence

against Jews in Hungary, plaintiffs argue, they are also concerned that their safety could be jeopardized if they were forced to go to Hungary to testify in court. That is in addition to the emotional trauma that might be inflicted on plaintiffs by being forced to pursue their claims in Hungary. Additionally, plaintiffs argue that a lawsuit against Hungarian banks during a deep recession would be exploited by some political factions to promote anti-Semitic prejudice.

We are sympathetic to plaintiffs' fears and concerns about the prospect of trying their claims in Hungary. But we should also remember that the claims asserted here arose in Hungary more than 65 years ago. Hungary is where much of the evidence and surviving witnesses are located. And courts often deal with emotionally charged cases and unpopular parties. The requirement of domestic exhaustion is not based on the relative convenience of two nations' courts. It is based on the power of U.S. courts to hear a claim and the comity between sovereign nations that lies close to the heart of most international law. Plaintiffs have presented nothing to indicate that the Hungarian courts would be so obviously incapable of providing a fair and impartial hearing that U.S. courts should take the extraordinary step of hearing these claims without even giving Hungarian courts an opportunity to address them.

Based on the information presented to us, plaintiffs have not presented a legally compelling reason for why the domestic exhaustion rule does not apply to their claims. We thus vacate the denial of the dismissal of

plaintiffs' claims against the national bank and national railway and remand those claims to the district court for a more detailed examination of this pivotal exhaustion issue. On remand, it will be defendants' burden to be specific about what the national bank calls the "variety of laws that Hungary has enacted to provide compensation to individuals in [plaintiffs'] position," that is, the remedies defendants claim are (or were) available to plaintiffs. Plaintiffs will then have three options. (1) They can voluntarily dismiss their claims against the national bank and national railway without prejudice and pursue their claims in Hungary using the remedies identified by defendants, with a possibility that they might refile their case in a U.S. court if and when they exhaust their remedies in Hungary. (2) They can ask the district court to stay their cases against the national bank and national railway while they pursue the Hungarian remedies identified by defendants. (3) They can ask the district court for an opportunity to develop further their arguments regarding the actual adequacy and availability of those remedies and the applicability of the domestic exhaustion rule.

We express no opinion on the merits of whether plaintiffs can meet the exhaustion requirement, but we note two additional points. First, given the delays since plaintiffs' claims arose, it is possible that adequate remedies that would have been reasonably available to plaintiffs in the past are no longer available. If such remedies are no longer available, that fact would not be sufficient by itself to show that the remedies are inade-

quate. Second, domestic Hungarian remedies need not be perfectly congruent with those available in the United States to be deemed adequate. Cf. *Minneci v. Pollard*, 132 S. Ct. 617, 625 (2012) (recognizing, in the context of a *Bivens* civil rights action, "the question is whether, in general, state tort law remedies provide roughly similar incentives for potential defendants to comply with the Eighth Amendment while also providing roughly similar compensation to victims of violations."); Brownlie, at 495 ("The remedies to be exhausted comprise all forms of recourse as of right, including administrative remedies of a legal nature but not extra-legal remedies or remedies of grace. The best test appears to be that an effective remedy must be available as a matter of possibility.") (internal quotations omitted).

### d. *Actionable Rights*

For the sake of completeness, we also consider the national bank's final challenge to whether the plaintiffs suing it have stated claims for expropriation in violation of international law. The complaint alleges violations of customary international law and relies on seven treaties and conventions as forbidding looting, conversion, and continued withholding of assets that prevent the next of kin of victims of genocide from reconstituting their communities. The national bank argues that those treaties and conventions cannot serve as the basis for any international law violation because they are not self-executing, do not provide private rights of

action, and are inapplicable to the extent they were not executed or ratified until after the Hungarian Holocaust at issue here.

Customary international law encompasses "the customs and usages of civilized nations," *Sosa*, 542 U.S. at 734, quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900), that are "specific, universal, and obligatory," 542 U.S. at 732, quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994); see also *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1016 (7th Cir. 2011). Customary international law does not stem from any single, definitive, readily identifiable source but is discerned from myriad decisions made in numerous and varied international and domestic arenas. *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 247-48 (2d Cir. 2003); see also *Flomo*, 643 F.3d at 1016. Customary international law thus resembles the domestic Anglo-American common law in its original sense, as law arising from custom rather than law that is formally promulgated. *Flomo*, 643 F.3d at 1016, citing 1 William Blackstone, *Commentaries on the Laws of England* 67-70 (1765).

As the district court noted, the plaintiffs suing the bank have based their claims upon violations of customary international law. Courts determine the content of customary international law by "consulting the works of jurists [*i.e.*, respected scholars], writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820); see also *Sampson*, 250 F.3d

at 1149, quoting *Smith*. It is not necessary that the treaties, charters, or conventions cited be self-executing or provide a private right of action. Conventions that not all nations ratify can still be evidence of customary international law. *Flomo*, 643 F.3d at 1021. As we explained above, the expropriations alleged by plaintiffs were an integral part of the planned genocide of the Hungarian Holocaust. And genocide has been recognized as a violation of customary international law. See Part II.B.3.a, above.

Finally on this topic, the national bank argues that the treaties, charters, and conventions cited in the complaint do not apply to the extent that they were not executed or ratified until after the Hungarian Holocaust at issue here. This appears to be an adoption of co-defendant OTP's argument that genocide did not achieve the status of a violation of international law until after the end of World War II. As was pointed out in oral argument, the Allies at Nuremburg hanged and imprisoned defendants for genocide. Where defendants' argument seems to lead, then, would be to the improbable conclusion that customary international law imposes a higher standard for making people pay money damages than for executing or imprisoning them. At oral argument OTP retreated from this position, and we decline to adopt it here.

### 4. *Nexus Requirement*

In addition to showing that rights in property taken in violation of international law are in issue, plaintiffs

must also meet what has been called the "nexus require-ment" of the expropriation exception in the FSIA. The statute provides two paths to establish this nexus. Plaintiffs could show that "property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(3). Alternately, plaintiffs could show that "property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

The plaintiffs in both the bank and railway cases rely on the second clause and therefore must establish that (a) the expropriated properties, or funds derived there-from, are currently owned or operated by the defendant, and (b) the defendant is engaged in a commercial activity in the United States. We conclude that the plain-tiffs suing the bank have alleged both elements sufficiently at this stage of the case. It is not clear to us, however, that the plaintiffs suing the railway have suf-ficiently alleged that it is engaged in commercial activity in the United States. We thus remand that issue to the district court with instructions to allow jurisdictional discovery on the issue of the national railway's U.S. commercial activity.

### a. *Owned or Operated*

Defendants argue that plaintiffs fail to satisfy the "owned or operated" prong because they have not suffi-

ciently pled defendants' retention of the taken property, arguing that the complaints' allegations are inadequate and conclusory under FSIA case law and implausible under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Even before the Supreme Court's recent tightening of pleading standards, some FSIA cases applying the "owned or operated" requirement held that plaintiffs may not merely parrot the statutory language or make unsupported allegations in their pleadings. See *Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998) (finding addition of "upon information and belief" to the first disjunctive clause of the statutory language insufficient to allege defendants currently owned or operated allegedly expropriated property); see also *Greenpeace*, 946 F. Supp. at 783; *Fickling v. Commonwealth of Australia*, 775 F. Supp. 66, 71-72 (E.D.N.Y. 1991) (finding allegation that "as a result of the acts complained of herein, defendants operated Johned and controlled the assets there[of]" was insufficient, noting, "[o]ther than this bald assertion, plaintiffs have wholly failed to set forth any facts which would lead this Court to conclude that defendants operated or controlled Johned or otherwise engaged in any commercial activity related to this action") (alterations original). One case faltered on a requirement that plaintiffs sufficiently allege defendant's *current* ownership of the expropriated property (or property exchanged for that property). *Alperin v. Vatican Bank*, 365 F. App'x 74, 75-76 (9th Cir. 2010) (finding plaintiffs failed to allege sufficiently that defendants currently owned or operated the property because (1) complaint alleged that de-

fendants retained a "significant portion" of the illegally expropriated property, but did not allege that the retained portion included property illegally taken from plaintiffs, and (2) complaint made no allegations as to the current location of that property). Similarly, allegations were held not sufficient where the expropriated property was alleged to be "owned or operated" by the defendant because the property had never been returned to its owners and restitution had never been made. *Freund v. Republic of France*, 592 F. Supp. 2d 540, 559-60 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939, 940 (2d Cir. 2010). The *Freund* court reasoned that when plaintiffs allege that the defendant owns or operates property exchanged for the expropriated property, they must sufficiently allege how the presently owned property was derived from the expropriated property. *Id.* at 560.

These demanding pleading requirements are difficult to reconcile with Federal Rule of Civil Procedure 8(a)(2), which provides: "A pleading that states a claim for relief must contain *a short and plain statement* of the claim showing that the pleader is entitled to relief . . ." (emphasis added), and with the forms approved as sufficient as part of the Federal Rules of Civil Procedure. For example, Form 15 is a complaint for conversion of property, which is the closest analog to plaintiffs' claims here. Rule 15 requires a statement of jurisdiction and then an allegation that: "On _date_, at _place_, the defendant converted to the defendant's own use property owned by

the plaintiff. The property converted consists of *describe*." With the addition of allegation of the value of the property and a demand for relief, the complaint is sufficient. See Fed. R. Civ. P. 84 ("The forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate."). The exceptions to the FSIA, including the expropriation exception and its elements, affect the court's subject-matter jurisdiction, but the Federal Rules of Civil Procedure also contemplate brief allegations of the basis for subject-matter jurisdiction. See Form 7.

In any event, we conclude that plaintiffs' allegations to satisfy the nexus requirement of the expropriation exception are sufficient. The plaintiffs suing the bank allege the expropriation of bank accounts and, in one case, a home. They further allege that the national bank either kept the expropriated property or exchanged it with other Hungarian banks or the Hungarian government for other property or rights in property, and currently operates the expropriated property (or property exchanged for it) in fractional reserve banking transactions. The plaintiffs suing the railway allege the expropriation of heirlooms, cash, suitcases, jewelry and other valuables, as well as leaseholds and the employment contracts, insurance benefits, and pensions of Jewish railway employees. They further allege that the national railway either kept the expropriated property or exchanged it for Nazi "credits" or "goodwill." In fact, according to the plaintiffs, the national railway to this day retains ownership of real property

that was leased to Jewish railway employees at the time they were deported to Auschwitz.[13]

---

[13] The national railway challenges the plaintiffs' allegations involving intangible property. The railway argues that plaintiffs' claims relating to expropriated intangible property, or tangible property that was exchanged for intangible property — as in the case of Nazi "credits" or "good-will" — cannot proceed under the expropriation exception. The national bank made a similar argument under the "rights in property" element, and we reject the argument here as we did above. Although a number of district courts have concluded that claims for intangible property are not permitted under the expropriation exception, the D.C. Circuit, the only circuit court to have ruled directly on the issue, concluded that claims for intangible property are permitted. We follow the D.C. Circuit and conclude that the railway plaintiffs' claims related to intangible property are not barred under the expropriation exception.

The national railway further urges that even if we determine that Nazi "credits" and "good-will" count as property for purposes of the expropriation exception, it cannot plausibly be suggested that the national railway continues to own or operate that property today. This argument is similar to the national bank's argument that post-war hyper-inflation destroyed the value of the Hungarian currency (and thus the value of expropriated bank accounts held in that currency). The fact that expropriated property (or property exchanged for that property) might no longer have the value it did at the time it was expropriated or exchanged would not mean that defendants no longer own or operate that property.

These allegations are not like those found insufficient in the FSIA cases cited above. First, several of the plaintiffs in the cited FSIA cases essentially pled themselves out of court. See, *e.g.*, *Freund*, 391 F. App'x at 940 (noting that "the complaint itself alleges a sequence of events that runs counter to any inference that the stolen 'property or any property exchanged for such property is owned or operated by'[the defendant]"); *Alperin*, 365 F. App'x at 75-76 (noting that complaint alleged that defendants laundered, converted, and retained a "significant portion" of the illegally expropriated property, but did not allege that the retained portion included property illegally taken from plaintiffs; complaint alleged only that the property was laundered, converted, and retained by defendants in the past but made no allegations as to the current location of that property). Moreover, unlike the plaintiffs in *Fickling* and *Crist*, plaintiffs here have done much more than merely say "defendant owns and operates expropriated property," or merely add "upon information and belief" to the statutory language. Unlike the plaintiffs in *Alperin*, plaintiffs here allege both that the expropriated property was retained and that defendants' retention of the property continues to the present. Plaintiffs may or may not be able to prove the point, but their allegations that defendants currently own or operate the allegedly expropriated property are sufficient at the pleading stage.

Nor are plaintiffs' allegations that defendants currently own or operate the expropriated property implausible. The national bank offers several

alternative explanations for what happened to plain-tiffs' property, including: (a) expropriated assets were required to be turned over to a state postal bank account (not held by the national bank); (b) the "Gold Trains" at the end of World War II were captured by the Allies[14]; (c) post-war hyper-inflation destroyed the value of the Hungarian currency, which was sub-sequently discontinued altogether; (d) Hungary's Com-munist regime nationalized private property; and (e) the national bank was required to alienate assets upon Hungary's admission in the European Union. The national railway also urges that the complaint against it "contains no allegations suggesting that the allegedly taken 'valuables' were not on the Gold Train, when in

---

[14] "In May 1945, forces of the U.S. Army seized a train near the town of Werfen, Austria containing valuables spirited out of Hungary by members of the pro-Nazi Hungarian government. This train, referred to by U.S. authorities as the 'Gold Train' or 'Werfen Train,' consisted of 24 rail cars containing gold, jewelry, works of art, household items, and other property, much of which had been confiscated from the Jewish population of Greater Hungary. U.S. authorities classified these assets as 'enemy government' property despite ample evidence linking the property to the Hungarian Jewish community. As a result of this classification, materials on the train were subject to requisition by American officials, and in some cases, the property was not returned." Presidential Advisory Comm'n on Holocaust Assets in the U.S., Plunder and Restitution: The U.S. and Holocaust Victims' Assets, at SR-113 to SR-114 (2000), *available at* http://pcha.ushmm.org/PlunderRestitution.html/html/Home_Contents.html.

fact that disposition of the property is exceedingly likely." These possibilities do not, as a matter of law, render plaintiffs' allegations facially implausible. Plaintiffs argue, and we are inclined to agree, that this argument may be a continuation of a now 65-year-long shell game. Even if it were appropriate to try to resolve such issues on the pleadings alone, and it is not, defendants have offered no case or fact that demonstrates conclusively that the value of the expropriated property is not traceable to their present day cash and other holdings. The national bank and national railway survived the war, the hyper-inflation and subsequent discontinuation of the Hungarian currency, the nationalization of property, and the admission to the European Union. It is not implausible that the value of plaintiffs' allegedly expropriated property also survived. And the national bank itself argues that the expropriation process was decentralized, so while national bank branches may have turned over expropriated assets to the state postal bank account (and those assets may have ended up on the Gold Trains), they also may not have. It is certainly possible that the value of plaintiffs' expropriated property was lost during one or more of these transitions. But it is also plausible that defendants retain the value of plaintiffs' expropriated property. Plaintiffs' claims that defendants currently own or operate their expropriated property (or property exchanged for such property) is not so implausible as to permit resolution on the pleadings alone.

The national bank has raised a more fundamental question that applies to some of the allegedly

expropriated property, which is whether bank accounts can be "owned or operated" at all within the meaning of the expropriation exception. The national bank cited the D.C. Circuit's decision in *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470 (D.C. Cir. 2007), for the proposition that the bank accounts were not "taken" for purposes of the expropriation exception. Because the *Nemariam* court framed the issue as whether defendants "owned or operated" the property taken in violation of international law, that is how we address it here. In *Nemariam*, the D.C. Circuit, held that, although "rights in property" under § 1605(a)(3) include intangible property, the expropriation exception did not apply to plaintiffs' claims because the bank accounts at issue were not owned or operated by the defendant bank. 491 F.3d at 481. Defining "owned or operated" as "possessed or exerted control or influence over," the court reasoned that the property right at issue was only the plaintiffs' "contractual right to receive payment," and that the defendant bank had not taken possession of that right. *Id.* (emphasis omitted). Rather, the bank extinguished plaintiffs' contract rights by declining to perform its own contractual obligations. *Id.* We respectfully question the D.C. Circuit's holding on this point.

The statutory language and FSIA's legislative history do not contain a definition of "owned or operated," but the House Report defined the phrase "taken in violation of international law," saying the term "would include the nationalization or expropriation of property without payment of the prompt adequate and effective com-

pensation required by international law." H.R. Rep. No. 94-1487, at 19-20. As the D.C. Circuit recognized, "the plain meaning of 'nationalization or expropriation' dovetails with the plain meaning of 'owned or operated.'" 491 F. 3d at 481.

For plaintiff Istvan Somogyi's claim that the national bank seized his grandparents' home, there is no question that the national bank "possessed or exerted control or influence over" the property at issue. See *Nemariam*, 491 F.3d at 481 (defining "owned or operated" as "possessed or exerted control or influence over"). Likewise, there would be no question if the national bank had coerced plaintiffs to sell their real property and to give the national bank the proceeds. Nor do we think there should be a question if the national bank had coerced plaintiffs to sell their real property and deposit the proceeds in an account with the national bank, and the national bank had then appropriated the value of that deposit account for its own purposes. We see no reason to distinguish, for purposes of international law of expropriation, between the latter and what allegedly occurred here — that the national bank seized plaintiffs' assets in the form of bank accounts and appropriated their value for its own use.

The Supreme Court has long held under American law that the exercise of eminent domain over intangible property constitutes a "taking," entitling the owner of the taken intangible property to just compensation. See, *e.g.*, *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 690 (1897) ("[A] contract is property, and, like any

other property, may be taken under condemnation pro-
ceedings for public use."); *U.S. Trust Co. of New York v.
New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are
a form of property and as such may be taken for a
public purpose provided that just compensation is
paid."). Here the national bank of Hungary is alleged to
have expropriated plaintiffs' bank accounts and taken
the value of those assets for itself. Furthermore,
plaintiffs allege that the national bank continues to lever-
age the value of their expropriated property by using it
as part of the national bank's fractional reserves in
loan operations, which plaintiffs allege is a continuous
source of profits to the bank.

The D.C. Circuit supported its line of reasoning in
*Nemariam* by citing a bankruptcy case, *Citizens Bank of
Maryland v. Strumpf*, 516 U.S. 16 (1995), an FSIA case
involving breach of an employment contract, *Brewer v.
Socialist People's Republic of Iraq*, 890 F.2d 97 (8th Cir. 1989),
and a district court case holding that the expropriation
exception covered only tangible property, *Canadian Over-
seas Ores Ltd. v. Compania de Acero Del Pacifico S.A.*, 528
F. Supp. 1337 (S.D.N.Y. 1982).

In *Strumpf*, when the debtor filed for bankruptcy, he
had both a checking account with the bank and a loan
from the same bank, for which he was in default. Under
the bankruptcy code, Strumpf's bankruptcy filing gave
rise to an automatic stay of various types of activity by
his creditors. The bank then placed what it termed
an "administrative hold" on an amount in Strumpf's
checking account equal to the amount due on his loan.

516 U.S. at 17-18. The Supreme Court noted that a bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor," but its decision that the bank's "*temporary* refusal to pay was neither a taking of possession of respondent's property nor an exercise of control over it" was informed by the fact that the bankruptcy code permits a creditor to refuse temporarily to pay a debt that is subject to setoff against a debt owed by the debtor. *Id.* at 21 (emphasis added). There is nothing temporary about the takings alleged here, which occurred more than 65 years ago. Nor has the national bank provided any legal justification for its refusal to grant plaintiffs access to their bank accounts. The only similarity between the present case and *Strumpf* is the fact that both relate to bank accounts.

*Brewer* also presented a very different fact situation. The *Brewer* plaintiffs entered into an employment contract with the Iraqi government to work at a tourist facility in Iraq. 890 F.2d at 98. A couple of years after plaintiffs began work, the defendants terminated the agreement and refused to pay plaintiffs, who were then evicted from their home in Iraq by unknown armed men and forced to board a plane leaving Iraq. *Id.* Plaintiffs' complaint contained three counts: breach of contract, reimbursement for converted property, and damages for infliction of emotional distress arising out of their forced eviction and expulsion from Iraq. *Id.* at 98-99. The district court granted plaintiffs default judgment on all three claims pursuant to the FSIA, but approved execution only on plaintiffs' claim for reimburse-

ment for converted property, reasoning that the breach of contract claim judgment did not create "rights in property" as defined in the FSIA, thereby foreclosing execution pursuant to 28 U.S.C. § 1610(a)(3). *Id.* at 100-01. Plaintiffs appealed the district court's denial of attachment and execution on their breach of contract and emotional distress claims, arguing that they were entitled to execution pursuant to § 1610(a)(3) because their claims created property rights. The Eighth Circuit noted that the district court had exercised jurisdiction over the breach of contract claim under the "commercial activity" exception, not the expropriation exception. The Eighth Circuit went on to declare that the district court could not have exercised jurisdiction over the breach of contract claim under the expropriation exception because the defendant's breach did not expropriate plaintiffs' contract rights. Rather, defendant's breach constituted a repudiation of the contract, and the Eighth Circuit decided that such a repudiation was not equivalent to expropriation. *Id.* at 101.

The plaintiffs here allege that the national bank did much more than repudiate some contracts. Plaintiffs allege that the national bank froze bank accounts pursuant to a series of discriminatory Hungarian laws and ordinances aimed at systematically stripping Hungarian Jews of their wealth. The plaintiffs further allege that the national bank expropriated the value of those accounts for its own enrichment. We believe the national bank's argument also fails to recognize the special nature of a contract establishing a bank account. It is not a typical exchange of money for goods or ser-

vices. A customer who deposits money in a bank trusts that bank, often with his life savings. Because of the high stakes, banks are subject to extensive regulation to assure their solvency and thus their ability to honor their contractual obligations. A solvent national bank's unilateral decision to keep its customers' money for itself cannot be compared to an ordinary breach of a commercial contract.

Nor does *Canadian Overseas* provide support for the argument that the national bank did not "own or operate" the expropriated property. As noted above, the *Canadian Overseas* court ruled that the expropriation exception applied only to tangible property, 528 F. Supp. at 1346, a position that *Nemariam* itself rejected, 491 F.3d at 478.

Although we question the D.C. Circuit's holding in *Nemariam* on the expropriation of bank accounts, we do not need to come to closure on the question in this appeal. Despite plaintiff Fischer's voluntary dismissal from the bank case, plaintiff Somogyi maintains a direct claim against the bank for the taking of his grandparents' home, which is tangible property. Furthermore, the bank plaintiffs seek to hold the defendant banks jointly and severally liable, and several plaintiffs with claims against the other defendant banks allege the taking of tangible property. Somogyi's claim and the fact that the other bank plaintiffs have alleged that a wide variety of property was taken mean that the *Nemariam* holding on bank accounts would not resolve the claims against the national bank. If plaintiffs eventually overcome the other obstacles they face

against the national bank, including the exhaustion of Hungarian remedies, we think the better course would be to allow further development of the factual record and legal arguments on the issue of expropriation of bank accounts. As for all other forms of property allegedly expropriated, the plaintiffs have sufficiently alleged that the national bank currently owns or operates the allegedly expropriated property or property exchanged for it.

### b. *Commercial Activity*

We turn to the next element of the nexus requirement in the FSIA's expropriation exception. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The FSIA's legislative history provides as examples of a "regular course of commercial conduct" commercial enterprises such as a mineral extraction company, an airline, or a state trading corporation. H.R. Rep. 94-1487, at 16. The House committee report went on to note that "a single contract, if of the same character as a contract which might be made by a private person, could constitute a 'particular transaction or act.' " *Id.*

For example, in *Altmann*, the defendant had authored, edited, and published in the United States a book about the women in paintings by Gustav Klimt and a guidebook with photographs of the stolen paintings, and had advertised exhibitions in this country. Those facts were

sufficient to demonstrate that the defendant had engaged in commercial activity in the United States. 317 F.3d 954, 969 (9th Cir. 2002), *amended*, 327 F.3d 1246 (9th Cir. 2003), *aff'd on other grounds*, 541 U.S. 677 (2004). Similarly, the fact that defendants entered transactions for joint publishing and sales in the United States constituted "commercial activity" in *Agudas Chasidei Chabad.* 528 F.3d at 946-48; see also *Cassirer*, 616 F.3d at 1032-34 (commercial activity included wide range of activities in connection with U.S. museum tour of artwork and sale of related merchandise); *de Csepel*, 808 F. Supp. 2d at 132 (commercial activity included loaning art to museums in the United States and receiving reciprocal benefits in exchange; encouraging U.S. tourism and allowing U.S. visitors to purchase admission tickets over the internet; publishing guide books in English that are sold to visitors from the United States at a gift shop that accepts U.S. credit cards; authoring and promoting books and selling them online through U.S. distributor, accepting orders for printed reproductions directly from U.S. residents shipping those prints directly to the United States, and engaging in tourist advertising in the United States).

For purposes of the FSIA expropriation exception, the commercial character of an activity "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). This means that the question is not whether the foreign government's motive is profit- or sovereignty-based. The issue is whether the actions that the foreign state

performs are the same type of actions by which a private party engages in commerce. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992).

The bank complaint alleges that the national bank has "substantial" contacts with the United States as the principal banking arm of the Hungarian government. The bank plaintiffs allege that the national bank not only places and clears "substantial" sums of funds with U.S. financial institutions but also supports and finances "hundreds of millions of dollars of direct investment" into the United States. Compl. ¶ 34. The jurisdictional discovery showed that the national bank has issued bonds denominated and payable in U.S. dollars and that one series is still outstanding. The $200 million bond series was issued in 1993 through a U.S. investment bank, and the bonds will mature on November 1, 2013. The national bank did not offer the bonds directly to the public; they were offered by the investment bank, and the national bank had no contacts with the American public in this transaction. Decl. of Dr. Orsolya Kerekes ¶ 11, Jan. 28, 2011, D. Ct. ECF No. 110. The national bank also makes periodic payments to the International Monetary Fund in Washington on behalf of the Republic of Hungary and acts as Hungary's authorized fiscal agent with respect to operations and transactions that may be carried out pursuant to the IMF Articles of Agreement. *Id.* ¶ 12. The national bank maintains that such activities are "conducted solely in connection with the management of its official reserves of the Republic of Hungary and debt management."

The fact that the national bank's U.S. activities are conducted "solely in connection with the management of its official reserves of the Republic of Hungary and debt management" does not control our inquiry, which requires us to look at the actions that are taken, not why they are taken. When a foreign government acts in the same manner as a private player in a market, the foreign sovereign's acts are "commercial" within the meaning of the FSIA. See *Weltover*, 504 U.S. at 614-15. Since maintaining correspondent banking relationships and issuing debt instruments are activities that private banks engage in, the national bank's activity is "commercial" in character.

The bank plaintiffs have alleged sufficiently that the national bank is engaged in a "commercial activity in the United States." Although its commercial activity is not as extensive as that of the defendants in *Altmann*, *Agudas Chasidei Chabad*, *Cassirer*, or *de Csepel*, the FSIA includes "a particular commercial transaction or act" within the definition of "commercial activity." A single contract, "if of the same character as a contract which might be made by a private person, could constitute a 'particular transaction or act.'" H.R. Rep. 94-1487, at 16. Particularly in light of the outstanding bond issue, the national bank's U.S. activities are sufficient to find that it is engaged in a commercial activity in the United States.

The national bank also takes a slightly different tack, claiming that due process considerations underlying the FSIA require a traditional personal jurisdiction inquiry. The national bank argues that it does not have

sufficient "minimum contacts" for due process purposes
so that the district court cannot exercise personal juris-
diction over it. See generally *International Shoe Co. v.
Washington*, 326 U.S. 310, 316 (1945). That may well be, for
as we explain in the separate opinion addressing
bank defendants OTP and MKB, the plaintiffs suing
the banks do not have a basis for exercising personal
jurisdiction over those private banks in this case. *Abelesz
v. OTP Bank*, ___ F.3d at ___.

As the plaintiffs correctly point out, however, the
"commercial activity" inquiry under the FSIA is not
congruent with a general personal jurisdiction in-
quiry. Other circuits have confronted the issue and have
held that foreign states are not "persons" entitled to
rights under the Due Process Clause. *Frontera Resources
Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*,
582 F.3d 393, 398-400 (2d Cir. 2009); see also *Price v.
Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95-100
(D.C. Cir. 2002). We agree. The FSIA requires only that
a sovereign defendant be engaged in "commercial
activity in the United States," and the allegations of the
national bank's U.S. activities are sufficient to meet
that standard.

The commercial activity issue with respect to the
national railway is not as clear. The plaintiffs allege that
the national railway conducts business in Illinois,
including the solicitation and sale of tickets and passes
for access to railway transportation in Hungary. To that
end, the plaintiffs further allege, the national railway
advertises unlimited travel on the National Rail Network

of Hungary and accepts U.S. currency, credit and debit card payments, and bank drafts as payment.

If the national railway does all of the things the plaintiffs allege in their complaint, it is certainly possible that it is involved in commercial activity in the United States. The national railway, however, submitted in the district court a Declaration from Ferenc Szarvas, its chief executive officer, that contradicts plaintiffs' allegations. The railway plaintiffs argue that we should not credit the Szarvas Declaration because it is "substantially inadmissible because it is based on almost no personal knowledge" and is of a "general nature that does not contrast the specific facts Plaintiffs allege." Plaintiffs are incorrect. In his Declaration, Szarvas states: "The statements made in this declaration are based upon my own personal knowledge or otherwise based upon historical facts and my review of [the national railway's] relevant records." He then goes on to contradict specifically each assertion made by the plaintiffs. He states that the national railway does not advertise, solicit, or sell tickets and passes for Hungarian rail travel, or accept payment for those services, in Illinois or in the United States. Szarvas further states that, since 2006, rail service in Hungary has been provided by MÁV START, a wholly-owned but legally distinct affiliate of the national railway.

The Szarvas Declaration is enough to raise a question as to what, if any, commercial activity the national railway conducts in the United States, and that jurisdictional question cannot be resolved on the pleadings.

We therefore remand the railway case to the district court with instructions to allow jurisdictional discovery on the extent of the national railway's U.S. activity, as well as the relationship between the national railway and the wholly-owned affiliate that actually provides rail service in Hungary.

To sum up our extended discussion of the FSIA's expropriation exception, we find that plaintiffs have sufficiently alleged that rights in property are at issue, that their property was taken, and that the national bank meets the nexus requirement. We remand the railway case for jurisdictional discovery on whether the national railway meets the nexus requirement. Whether the takings violated international law depends on whether Hungary offers or has offered a meaningful domestic remedy, and we remand both cases for further proceedings on that question.

C. *Treaty-Based Defenses*

Apart from the expropriation exception, both the national bank and national railway argue that Hungary's treaties with the United States bar jurisdiction over the claims against them. FSIA immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment" of the FSIA. 28 U.S.C. § 1604. This "treaty exception" applies "when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA." *Amerada Hess Shipping Corp.*, 488 U.S. at 442, quoting H.R. Rep. No. 94-1487, at 17. Any conflict between a treaty and the FSIA immunity

provisions, whether toward more or less immunity, is within the treaty exception. See *Moore v. United Kingdom*, 384 F.3d 1079, 1084-85 (9th Cir. 2004). Thus, "[i]f there is a conflict between the FSIA and [an existing international agreement] regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *Id.* at 1085.

Defendants argue that the 1947 Treaty, 61 Stat. 2065, and the 1973 Agreement, 24 U.S.T. 522, give them greater sovereign immunity than the FSIA does from U.S. litigation of Holocaust-era property expropriation claims and preclude the district court from exercising jurisdiction over them. Defendants argue that because the 1947 Treaty (a) addressed property discriminatorily expropriated by Hungary during World War II, (b) created an executive branch mechanism to resolve disputes regarding the performance of treaty obligations, and (c) did not expressly create a private right of action, the 1947 Treaty expressly conflicts with the FSIA. Likewise, the national bank argues that the 1973 Agreement codified the executive branch's exclusive dominion over Hungarian Holocaust reparations claims by providing for the Foreign Claims Settlement Commission to administer any covered claims process without allowing for judicial oversight.

The 1947 Treaty and the 1973 Agreement do not "expressly conflict" with the immunity provisions of the FSIA. Defendants are correct that, under Article 27 of the 1947 Treaty, Hungary was responsible for returning expropriated property or providing fair compensation

in its stead. But Article 27 spoke exclusively to Hungary's obligations. It said nothing about the rights and responsibilities of the people from whom Hungary expropriated property. Article 40 of the 1947 Treaty did establish an exclusively executive branch mechanism — but only for disputes concerning the interpretation or execution of the Treaty, not for disputes concerning restitution for expropriated property. Nor does the fact that the 1947 Treaty lacks a private cause of action shed any light on the subject. Plaintiffs' claim is predicated on expropriation in violation of customary international law, not the 1947 Treaty.

As for the 1973 Agreement, it operates to provide "full and final settlement and [ ] discharge of all *claims of the Government and nationals of the United States* against the Government and nationals of the Hungarian People's Republic . . . ." 24 U.S.T. 522, art. 1 (emphasis added). It is the position of the State Department Office of the Legal Advisor that the 1973 Agreement settled and discharged claims of U.S. nationals who were U.S. nationals at the time their claims arose. See *de Csepel*, 808 F. Supp. 2d at 133-34. "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982). Regardless of plaintiffs' present citizenships, as defendants have argued regarding the "domestic takings" rule, the claims in these cases are those of people who were Hungarian nationals at the time of the alleged expropriations. Thus, the 1973 Agreement's provision for the Foreign Claims

Settlement Commission to administer covered claims does not apply in this case. Because the 1947 Treaty and the 1973 Agreement do not "expressly conflict" with the FSIA, the "treaty exception" does not deprive the district court of subject-matter jurisdiction in this case.

D. *Immunity from Remaining Claims*

The national railway argues that beyond Count I of the railway complaint (and certain allegations in Counts IV, VIII, and IX), plaintiffs' remaining claims in the railway complaint cannot fit within the expropriation exception to FSIA immunity, assuming it applies, because they concern personal injuries or other non-property-based torts (Count II — Aiding and Abetting Genocide, Count III — Complicity in Genocide, Count VII — Fraudulent Misrepresentations) or else they rest on domestic rather than international, law (Count V — Unlawful Conversion and Count VI — Unjust Enrichment). The district court did not discuss these remaining claims, and the national railway argues that the district court erred in not dismissing them because none of these claims can proceed under any of the FSIA's exceptions.

The railway plaintiffs respond by noting that the FSIA is a jurisdictional statute — circumscribing the subject-matter that can be heard by the federal courts. They contend that once a court determines it has subject-matter jurisdiction over a plaintiff's claims, other legal sources provide the substantive causes of action that make up that plaintiff's claims. From there, the railway plaintiffs argue, once subject-matter jurisdiction is estab-

lished under the FSIA for one claim, plaintiffs may bring any claims they have against the sovereign defendant.

Plaintiffs are right up to a point, but their conclusion does not follow. The FSIA is a jurisdictional statute and does not create an independent cause of action. So, for our purposes, the expropriation exception provides that a foreign sovereign will not be immune to suit in U.S. court where "rights in property taken in violation of international law are in issue" and one of two nexus requirements is met. 28 U.S.C. § 1605(a)(3). The FSIA does not tell us when property was expropriated "in violation of international law" — we must look to other domestic and international legal sources to make that determination. But the expropriation exception in the FSIA authorizes jurisdiction only for claims for the taking of property in violation of international law.

The analysis under the expropriation exception must be on a claim-by-claim basis. See 28 U.S.C. § 1606 ("As to any *claim* for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . .") (emphasis added); *Siderman de Blake,* 965 F.2d at 706 ("As a threshold matter . . . a court adjudicating a claim against a foreign state must determine whether the FSIA provide subject matter jurisdiction *over the claim*.") (emphasis added). Claims against foreign sovereigns that do not fall within the ambit of an FSIA exception are barred by

sovereign immunity. As we noted above in discussing the "domestic takings" rule, we agree that plaintiffs cannot bring claims for personal injury or death under the expropriation exception.

*Conclusion*

Because plaintiffs have not exhausted their Hungarian remedies and have not yet provided a legally compelling reason for their failure to do so, they have not established that their expropriation claims fall within an exception to the FSIA's grant of sovereign immunity. In addition, the plaintiffs suing the national railway have not established yet that the railway is engaged in commercial activity in the United States, as required to apply the expropriation exception to the FSIA. We VACATE the denials of the motions to dismiss for lack of subject-matter jurisdiction by the national bank (MNB) and the national railway (MÁV) and REMAND for further consideration of the exhaustion issue. The first step will be to ensure that the defendants have already identified or now identify one or more specific remedies that are or were adequate and reasonably available to plaintiffs. If the defendants do so, the district court may stay these proceedings or dismiss without prejudice while plaintiffs pursue their claims in Hungary. If plaintiffs believe they can demonstrate a legally compelling reason for their failure to exhaust identified Hungarian remedies, one sufficient to overcome the comity due between nations, they may ask the district court for a hearing to develop the record further on this

point. In addition, the district court shall allow plaintiffs in the railway case to pursue jurisdictional discovery on the commercial activity issue and then reconsider whether the national railway is engaged in commercial activity in the United States.

VACATED AND REMANDED.