FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEVAS MULTIMEDIA PRIVATE LIMITED, | No. 20-36024 |
| *Petitioner-Appellee*, | D.C. No. 2:18-cv-01360-TSZ |
| CC/DEVAS (MAURITIUS) LIMITED; DEVAS MULTIMEDIA AMERICA, INC.; DEVAS EMPLOYEES MAURITIUS PRIVATE LIMITED; TELCOM DEVAS MAURITIUS LIMITED, | ORDER |
| *Appellees-Intervenors*, | |
| v. | |
| ANTRIX CORP. LTD., | |
| *Respondent-Appellant*. | |

| | |
|---|---|
| DEVAS MULTIMEDIA PRIVATE LIMITED, | No. 22-35085 |
| *Petitioner-Appellant*, | D.C. No. 2:18-cv-01360-TSZ |

CC/DEVAS (MAURITIUS) LIMITED; TELCOM DEVAS MAURITIUS LIMITED; DEVAS MULTIMEDIA AMERICA, INC.; DEVAS EMPLOYEES MAURITIUS PRIVATE LIMITED,

*Intervenor-Plaintiffs-Appellees*,

v.

ANTRIX CORP. LTD.,

*Respondent*.

DEVAS MULTIMEDIA PRIVATE LIMITED,

*Petitioner*,

and

CC/DEVAS (MAURITIUS) LIMITED; DEVAS MULTIMEDIA AMERICA, INC.; DEVAS EMPLOYEES MAURITIUS PRIVATE LIMITED; TELCOM DEVAS MAURITIUS LIMITED,

No. 22-35103

D.C. No. 2:18-cv-01360-TSZ

*Intervenor-Plaintiffs-Appellees*,

v.

ANTRIX CORP. LTD.,

   *Respondent-Appellant*.

Filed February 6, 2024

Before:  Eric D. Miller and Lucy H. Koh, Circuit Judges, and Donald W. Molloy,[*] District Judge.

Order;
Statement by Judge O'Scannlain;
Dissent by Judge Bumatay

## SUMMARY[**]

### Personal Jurisdiction / Foreign Sovereign Immunities Act

The panel filed an order denying petitions for rehearing en banc and directing that no further petitions will be

---

[*] The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

entertained, in a case in which the panel held that the district court erred in exercising personal jurisdiction over Antrix Corp. Ltd., an Indian corporation, under the Foreign Sovereign Immunities Act, because plaintiff failed to establish that Antrix had the requisite minimum contacts for personal jurisdiction.

In a statement respecting the denial of rehearing en banc, Judge O'Scannlain wrote that he agreed with the views expressed by Judge Bumatay in his dissent from the denial of rehearing en banc.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, and VanDyke, wrote that the Foreign Sovereign Immunities Act, governing when foreign states may be sued in federal court, does not require plaintiffs to also prove "minimum contacts" to assert personal jurisdiction over a foreign state, and this court's error in holding otherwise should be corrected through rehearing en banc.

## ORDER

The panel has unanimously voted to deny the petitions for rehearing en banc. Judge Miller and Judge Koh have voted to deny the petitions for rehearing en banc, and Judge Molloy so recommends.

The full court has been advised of the petitions for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35(f).

The petitions for rehearing en banc, (20-36024 Dkts. No. 111, 112; 22-35085 Dkt. No. 56; 22-35103 Dkt. No. 63), are DENIED.  No further petitions for rehearing or rehearing en banc will be entertained.  Judge O'Scannlain's statement respecting the denial of en banc rehearing and Judge Bumatay's dissent from the denial of en banc rehearing are filed concurrently herewith.

---

O'SCANNLAIN,[1] Circuit Judge, respecting the denial of rehearing en banc:

I agree with the views expressed by Judge Bumatay in his dissent from the denial of rehearing en banc.

---

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).  We thus have a "virtually unflagging" obligation to "hear and decide cases within [our] jurisdiction."    *Lexmark Int'l, Inc. v. Static Control*

---

[1] As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc.  *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a).  Following our court's general orders, however, I may participate in discussions of en banc proceedings.  *See* Ninth Circuit General Order 5.5(a).

*Components, Inc.*, 572 U.S. 118, 126 (2014) (simplified). When reading jurisdictional statutes, our task is to simply "apply traditional principles of statutory interpretation" and ask whether Congress authorized suit. *See id*. at 128. It should go without saying that we do not "ask whether in our judgment Congress *should* have authorized . . . suit." *Id.*

In 1976, Congress enacted the Foreign Sovereign Immunities Act ("FSIA") to govern when foreign states may be sued in federal court. 28 U.S.C. § 1602 *et seq*. As a default, the FSIA establishes that foreign states are immune from the jurisdiction of federal courts. *Id.* § 1604. But Congress set aside sovereign immunity for claims that fall within certain specified exceptions. *See id.* §§ 1605, 1605A, 1605B. Those exceptions range from pursuing state sponsors of terrorism to recovering damages for violations of commercial agreements. And Congress did not mince its words in providing jurisdiction for these claims. The FSIA states that "[p]ersonal jurisdiction over a foreign state *shall exist*" when enumerated claims are brought with proper service. *Id.* § 1330(b) (emphasis added). Such mandatory language leaves no room for courts to alter the immunity inquiry. Put simply, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Republic of Argentina v. NML Cap., Ltd*., 573 U.S. 134, 141–42 (2014).

This case presents a straightforward question. Despite the FSIA's text, does the Act require plaintiffs to *also* prove "minimum contacts" to assert personal jurisdiction over a foreign state? Unlike every other federal court, the Ninth Circuit answers "yes." And saying "yes" is a big deal—it means that we lock the courthouse doors to plaintiffs whom Congress expressly granted access. So victims of terrorism, those harmed by violations of international law, and persons

who suffered from torture may be barred from seeking justice in our courts. *See* 28 U.S.C. §§ 1605, 1605A, 1605B. Congress swung the doors open and we slammed them shut. Our failure to correct this error violates the separation of powers and anoints ourselves gatekeepers in a way not contemplated by Congress or the Constitution.

The problem started more than 40 years ago. Back then, our court appended minimum contacts to the list of requirements that plaintiffs must establish to assert jurisdiction over a foreign state. *See Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica* ("*Gonzalez*"), 614 F.2d 1247, 1255 (9th Cir. 1980). There, we said, "[p]ersonal jurisdiction under the [FSIA] requires satisfaction of the traditional minimum contacts standard." *Id*. We thus replaced the words "shall exist" in § 1330(b) with "may exist" and substituted our own view that Congress must have really wanted foreign states to also have sufficient minimum contacts with the United States. Under our rule, then, personal jurisdiction exists only when our judicially created hurdle is satisfied.

And we made this interpretive move under the most dubious of guises—legislative history. While strongly disfavored today, back in 1980, it was more common to determine meaning not from statutory text, but from legislative accoutrements. And that's what we did. We looked at a single House Committee Report and surmised what we thought Congress really wanted. *See Gonzalez*, 614 F.2d at 1255 ("The legislative history of the Act confirms that the reach of § 1330(b) does not extend beyond the limits set by the *International Shoe* line of cases."). "The question, however, is not what Congress 'would have wanted' but what Congress enacted in the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).

Today, it's obvious that we cannot appeal to legislative history to undo a statute's plain meaning. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). So we know that *Gonzalez*'s interpretation is wrong. But even if that history mattered, the Report doesn't say what *Gonzalez* thought it said about minimum contacts. The Report merely observed that the Act's exceptions "embodied" a minimum-contacts analysis. *Gonzalez*, 614 F.2d at 1255 n.5 (quoting the Committee Report). It says nothing about adding *another* layer of minimum-contacts review before denying foreign-state immunity. To my knowledge, no other court interprets the FSIA this way.

And nothing in the Constitution requires a minimum-contacts analysis either. Federal courts have uniformly recognized that foreign states are not entitled to the protection of minimum contacts under the Fifth Amendment. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 99 (D.C. Cir. 2002); *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399–400 (2d Cir. 2009); *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 694 (7th Cir. 2012). The Supreme Court has also suggested the same. *See Weltover*, 504 U.S. at 619. So the Due Process Clause fails to justify our wayward precedent.

Despite all this, our court not only perpetuates, but arguably expands, the minimum-contacts requirement here. *See Devas Multimedia Priv. Ltd. v. Antrix Corp.*, 2023 WL 4884882, at *1–2 (9th Cir. 2023). While *Gonzalez* merely dealt with the commercial activities exception, *see* 614 F.2d at 1255, our court seemingly rules that the minimum-contacts inquiry extends to *all* exceptions under the FSIA. *Devas*, 2023 WL 4884882, at *1–2. In this case, we applied it to a new context—the arbitral exception—for the first

time.  *See* 28 U.S.C. § 1605(a)(6).  We did so even while a majority of the panel recognized that "our precedent applying the minimum-contacts test to the exercise of personal jurisdiction over foreign states has no foundation in the Constitution or the FSIA, and it is contrary to the views of other courts of appeals."  *Devas*, 2023 WL 4884882, at *4 (Miller, J., joined by Koh, J., concurring).  So while the majority of the panel disagrees with our precedent, it expanded its troubling reach.

This case presented an opportunity to correct our erroneous precedent and apply the FSIA the way Congress enacted it.  But our court refuses to step in and denies en banc review.  And it's hard to explain why.  Sure, it's true that the specific dispute between Devas Multimedia and Antrix Corporation raises some *other* complexities—like whether Antrix is sufficiently controlled by India to be considered a foreign state.  But those other questions are secondary to whether foreign states are entitled to a minimum-contacts analysis in the first place.  Those subsidiary questions are thus distractions that should have been left to the three-judge panel to resolve.  At a minimum, we should have overruled *Gonzalez* and discarded our blanket bar to bringing claims against foreign states unless plaintiffs can prove minimum contacts.

After all, how many would-be plaintiffs gave up valid claims in the Ninth Circuit because of our out-of-sync rule?  How many plaintiffs had to seek redress in other courts to sidestep our precedent?  And how many plaintiffs were simply kicked out of our courts by the minimum-contacts requirement?  The effect of our ruling is unquestionably significant.  Under a proper reading of the FSIA, those plaintiffs should be welcome to bring their claims in our circuit.

Because we fail our "unflagging" duty to hear and decide cases within our jurisdiction, I respectfully dissent from the denial of rehearing en banc.

## I.

## A.

Let's begin with a brief overview of the FSIA. The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Weltover*, 504 U.S. at 610. The Act "standardize[s] the judicial process with respect to immunity for foreign sovereign entities in civil cases." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023).

The FSIA starts from the "baseline" that foreign states and their instrumentalities are entitled to sovereign immunity in our courts. *Id*. (citing 28 U.S.C. § 1604). But Congress then specified certain exceptions when that immunity is withheld. The FSIA provides that:

> (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
>
> (b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over

which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

28 U.S.C. § 1330.

So whenever an exception applies, Congress grants personal jurisdiction over a foreign state "as to every claim for relief" after proper service. *Id.* § 1330(b). Thus, the FSIA "bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and [then] confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). In other words, Congress closed the door on suits against foreign states, while leaving the keys for some types of claims.

The FSIA exceptions to immunity cover many subject matters.

- *Commercial Activities*— Cases "in which the action is based upon a commercial activity . . . that . . . causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

- *Expropriation*— Cases "in which rights in property taken in violation of international law are in issue and that property [has a connection to the United States]." 28 U.S.C. § 1605(a)(3).

- *Arbitration*— Cases "in which the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate" including when that award

"is or may be governed by a treaty or other international agreement in force . . . calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

- *Terrorism—* Cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . [by] a state sponsor of terrorism." 28 U.S.C. § 1605A.

As part of Congress's "carefully calibrated scheme," it also established procedures governing suits under the FSIA. *Turkiye Halk Bankasi*, 598 U.S. at 273. Congress included many specifics, like a venue provision, 28 U.S.C. § 1391(f), service of process requirements, *id.* § 1608, and a bar on punitive damages, *id.* § 1606. And foreign states are "liable in the same manner and to the same extent as a private individual under like circumstances." *Id.*

Finally, the FSIA does not just cover direct suits against a foreign government. Instead, "[t]he FSIA defines a 'foreign state' to [also] encompass instrumentalities of a foreign state." *Turkiye Halk Bankasi*, 598 U.S. at 272 (citing 28 U.S.C. §§ 1603(a)–(b)). This definition "includ[es] entities that are directly and majority-owned by a foreign state." *Id.* Thus, personal jurisdiction may exist over a foreign sovereign and its state-owned companies.

## B.

Now, a quick rundown of this case. Antrix is a company wholly owned by the Republic of India. India incorporated Antrix to market goods and services created by the country's

Department of Space and the Indian Space Research Organization.  Devas was a private company created by a group of American investors and executives to develop telecommunications services in India.  The two companies agreed to work together to build, launch, and manage telecommunication satellites.  To carry out this agreement, they signed a contract which included an arbitration provision.  Eventually, Antrix sought to terminate the agreement; Devas responded by initiating arbitration.  A foreign arbitration tribunal found for Devas and awarded it $562.5 million in damages.  Devas and Antrix then filed dueling petitions in the Indian courts—Devas's to confirm the award and Antrix's to set it aside.

While the Indian proceedings were pending, Devas sought to confirm the award elsewhere.  It petitioned to confirm the arbitration award in the Western District of Washington, where Antrix has business relationships with several firms.  Devas relied on the arbitral exception to the FSIA.  *See* 28 U.S.C. § 1605(a)(6).  Although it was uncontested that Antrix is a "foreign state" under the FSIA, service was proper, and Devas's claim falls under the arbitral exception, Antrix still argued personal jurisdiction was improper.

The district court rejected Antrix's jurisdictional challenge.  It first held that personal jurisdiction was satisfied under the FSIA, because the "parties d[id] not dispute that personal jurisdiction exists as a matter of statute."  The district court then concluded that foreign states are not entitled to minimum contacts under the Due Process Clause and, even if they were, Antrix had sufficient contacts.  And the district court held that the Republic of India "exercises sufficient control" over Antrix such that it should be treated the same as the country for purposes of the due

process analysis.  As a result, the district court ruled that personal jurisdiction was proper, confirmed the award, and entered judgment for $1.293 billion (after the inclusion of pre-award and post-award interest).  Antrix then appealed from the district court's judgment.

After that notice of appeal, there were two developments. First, the Indian government placed Devas into liquidation on the grounds that it had fraudulently conducted its affairs. As a result, several shareholders of the company and its American subsidiary intervened.  The district court then permitted the intervenors post-judgment discovery and granted them leave to register the judgment.  Both Antrix and Devas (under the control of a liquidator) appealed the order granting them leave to register the judgment.

Second, during the appeal, an Indian court set aside the arbitration award.  Antrix now claims that the award is no longer enforceable, which Devas and the intervenors dispute.  Because these events occurred after the notice of appeal here, Antrix sought a limited remand to determine whether the district court should reverse its judgment on the merits.

On appeal, our court brushed past all these developments and complications and simply held that the district court lacked personal jurisdiction over Antrix.  The panel ruled that the district court was bound to apply the minimum-contacts analysis from *Gonzalez* because (1) the Supreme Court has not contradicted our prior holding and (2) our court's minimum-contacts inquiry is based on a statutory interpretation of the FSIA.  The panel then easily rejected the argument that minimum contacts were satisfied here. Because it concluded that the district court lacked personal

jurisdiction, the panel didn't address any other question on appeal.

Judge Miller wrote a concurrence, joined by Judge Koh. He explained that "our precedent applying the minimum-contacts test to the exercise of personal jurisdiction over foreign states has no foundation in the Constitution or the FSIA, and it is contrary to the views of other courts of appeals." *Devas*, 2023 WL 4884882, at *4 (Miller, J., concurring). He recommended that, "[i]n an appropriate case," we should reconsider our erroneous precedent en banc. *Id.*

So the *sole question* for the en banc court was whether plaintiffs must prove minimum contacts before federal courts may assert personal jurisdiction over foreign states under the FSIA. Of course, answering that question may lead to other questions.[1] But that's no reason to punt on this case. As we often do, we could have left those subsidiary questions to the three-judge panel or district court after correcting our precedent. We were wrong to shy away from this significant question.

I now turn to that question.

---

[1] For example, Antrix argues that its corporate status may independently mean it deserves due process protection. While that question adds another wrinkle to this case, it would not prevent the en banc court from answering whether a foreign state is entitled to a minimum-contacts inquiry under the FSIA or the Due Process Clause. We could have then remanded to the district court to see whether Antrix should be treated the same as India. *See Frontera,* 582 F.3d at 400–01 (remanding to the district court to determine whether a state-owned corporation was entitled to due process).

## II.

While the Supreme Court has called the FSIA Congress's "comprehensive framework" for resolving claims of sovereign immunity, *Weltover*, 504 U.S. at 610, the Ninth Circuit thinks it is not quite comprehensive enough. Forty years ago, our court held that Congress's command that personal jurisdiction "shall exist" when an enumerated exception is met, 28 U.S.C. § 1330(b), was really just the starting point. We then rewrote the statute to add a minimum-contacts requirement. Only after satisfying our minimum-contacts inquiry does our court permit personal jurisdiction over a foreign state.

This is not the law enacted by Congress and signed by the President. We have no authority to make up our own rules, especially when dealing with international affairs. *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018) ("[C]ourts traditionally deferred to the decisions of the political branches . . . on whether to take jurisdiction over actions against foreign sovereigns." (simplified)). And nothing in the Due Process Clause mandates our statutory interpretation. Rather than extending our dubious precedent, we should have used this case to discard it.

### A. The FSIA's Text Doesn't Require Minimum Contacts

Despite the clear command that personal jurisdiction over a foreign state "shall exist" when an enumerated exception applies, 28 U.S.C. § 1330(b), we adjoined a new requirement to the FSIA in *Gonzalez*. In that case, we said that "[p]ersonal jurisdiction under the Act requires satisfaction of the traditional minimum contacts standard." *Gonzalez*, 614 F.2d at 1255. We thus added a layer of review found nowhere in the text.

What supported this minimum-contacts regime?    The tersest of reasoning.

*Gonzalez* first looked to the phrase "direct effect" in one exception—the commercial activities exception—and seemingly read an across-the-board minimum-contacts requirement from those two words.    The commercial activities exception provides for jurisdiction "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."    28 U.S.C. § 1605(a)(2).    *Gonzalez* explained that the term "'direct effect' . . . ha[s] been interpreted as embodying the minimum contacts standard" of *International Shoe* and its progeny. 614 F.2d at 1255.    As support, *Gonzalez* cited two opinions suggesting that § 1605(a)(2) incorporates the minimum-contacts requirement.    *Id*. (citing *Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676 (2d Cir. 1979) and *East Eur. Domestic Int'l Sales Corp. v. Terra*, 467 F. Supp. 383, 388–90 (S.D.N.Y. 1979)).    *But see Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 394 (6th Cir. 2016) (holding that "the 'direct effect' requirement does not incorporate the 'minimum contacts' test").

Next, *Gonzalez* looked outside the text—to legislative history.    It stated that "[t]he legislative history of the Act confirms that the reach of § 1330(b) does not extend beyond the limits set by the *International Shoe* line of cases." *Gonzalez*, 614 F.2d at 1255.

That's the entirety of *Gonzalez*'s textual analysis.    Based on these flimsy data points, *Gonzalez* broadly proclaimed: "Personal jurisdiction under the Act requires satisfaction of the traditional minimum contacts standard."    *Id*.

The errors here are obvious—

First, *Gonzalez* didn't ground its analysis in the text of § 1330(b). And it is hard to imagine a clearer statute. It states that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under [an FSIA exception and] where service has been made[.]" 28 U.S.C. § 1330(b). That presents a simple if-then statement. When subject-matter jurisdiction and service are proper under the FSIA, the district court "shall" have personal jurisdiction. The word "shall" connotes a "mandatory" requirement. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154 (2013). When "the statutory language is mandatory," Congress "does not [provide for] discretion." *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007).

Every circuit that has analyzed the FSIA has refused to find a statutory minimum-contacts requirement under § 1330(b). *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005); *Frontera*, 582 F.3d at 396; *Abelesz*, 692 F.3d at 694; *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1303 (11th Cir. 2000). The FSIA thus "clearly expresses the decision of the Congress to confer upon the federal courts personal jurisdiction over a properly served foreign state." *TMR Energy*, 411 F.3d at 303.

Second, *Gonzalez* simply mixes up subject-matter jurisdiction and personal jurisdiction. The commercial activities exception, along with the other FSIA exceptions, provides subject-matter jurisdiction to federal courts. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992) ("A federal court lacks subject-matter jurisdiction over a claim against a foreign state unless the

claim falls within an exception to immunity under the FSIA.").   But *subject-matter jurisdiction* is a separate question from *personal jurisdiction*, which is governed by § 1330(b).  So holding that § 1605(a)(2) creates a universal minimum-contacts requirement for § 1330(b) conflates the two concepts and makes no textual sense.

Third, *Gonzalez* was wrong to alter the clear text of § 1330(b) based on legislative history.  While there was once a time when courts would look to legislative history to discern a statute's meaning, that time has long since passed. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n.29 (1971) (only looking to the "statutes themselves" after concluding that the legislative history was "ambiguous").  Today, the rule is simple: "legislative history is not the law."  *Epic Sys. Corp.*, 584 U.S. at 523.  "[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law."  *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 337 (1994).  So "to interpret the statute, we look first to the statute's language itself and the specific context in which that language is used." *Resisting Env't Destruction on Indigenous Lands, REDOIL v. EPA*, 716 F.3d 1155, 1161 (9th Cir. 2013) (simplified).

Even for those who find legislative history persuasive, it does not support *Gonzalez*'s minimum-contacts test for the FSIA.   *Gonzalez*'s analysis of that legislative history consisted merely of a block quote of a House Committee Report:

> (b) Personal Jurisdiction. Section 1330(b) provides, in effect, a Federal long-arm statute over foreign states (including political subdivisions, agencies, and instrumentalities of foreign states). It is patterned after the

long-arm statute Congress enacted for the District of Columbia. Public Law 91-358, sec. 132(a), title I, 84 Stat. 549. The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision. Cf. International Shoe Co. v. Washington, 326 U.S. 310 (, 66 S.Ct. 154, 90 L.Ed. 95) (1945), and McGee v. International Life Insurance Co., 355 U.S. 220, 223 (, 78 S.Ct. 199, 201, 2 L.Ed.2d 223) (1957). For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity. Significantly, each of the immunity provisions in the bill, sections 1605-1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction. Besides incorporating these jurisdictional contacts by reference, section 1330(b) also satisfies the due process requirement of adequate notice by prescribing that proper service be made under section 1608 of the bill. Thus, sections 1330(b), 1608, and 1605-

1607 are all carefully interconnected. (Footnotes omitted.)

*Gonzalez*, 614 F.2d at 1255 n.5 (quoting H.R. Rep. No. 94-1487, at 13–14 (1976)).

Although unclear, perhaps *Gonzalez* relied on the Report's statement that the "requirements of minimum jurisdictional contacts and adequate notice are embodied in" § 1330(b). *Id.* But that doesn't support appending an additional minimum-contacts inquiry to § 1330(b). The Report was just noting that the FSIA's *enumerated exceptions* by themselves satisfy the requirement of "some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction." *Id.* So the Report determined that satisfying one of these exceptions meets "the necessary contacts which must exist before our courts can exercise personal jurisdiction." *Id.* It says nothing about a minimum-contacts analysis over and above satisfying a statutory exception. And if all that were not enough, the arbitral exception was added more than a decade after the Committee Report, making application of a minimum-contacts test here even more dubious. *See* Pub. L. No. 100-669, § 2, 102 Stat. 3969, 3969 (1988).

All told, this was the time to correct our circuit's misstep. All parties agree that an FSIA exception applied and service was proper. *Devas*, 2023 WL 4884882, at \*1. With those two requirements satisfied, Congress's command should have been mandatory. Rather than adhering to the plain text of the statute, we instead expanded our precedent to cover all FSIA exceptions.

## B. The Due Process Clause Doesn't Require Minimum Contacts

Perhaps realizing *Gonzalez*'s shaky textual foundation, some of our later precedents began couching our minimum-contacts inquiry as a constitutional requirement. *See Gregorian v. Izvestia*, 871 F.2d 1515, 1528–29 (9th Cir. 1989) (sourcing the requirement in the "constitutional constraints of the Due Process clause"); *Altmann v. Republic of Austria*, 317 F.3d 954, 969–70 (9th Cir. 2002) (after concluding that the FSIA is satisfied, conducting a minimum-contacts analysis "[a]ssuming that a foreign state is a 'person' for purposes of the Due Process Clause"). But the Due Process Clause does not rescue our improper addition of a minimum-contacts requirement. As a matter of original meaning and modern precedent, the Fifth Amendment's Due Process Clause does not extend the benefit of minimum contacts to foreign states.

Start with modern jurisprudence. The Supreme Court has never said that the Due Process Clause applies to foreign states. In fact, it has suggested the opposite. Nearly 60 years ago, the Court held that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966). Later, while leaving whether "a foreign state is a 'person' for purposes of the Due Process Clause" open, the Supreme Court strongly hinted that foreign states should be treated the same as domestic States—meaning no due process protection. *Weltover*, 504 U.S. at 619 (citing *Katzenbach*'s holding that "States of the Union are not 'persons' for purposes of the Due Process Clause").

Since *Weltover*, the consensus of circuit courts has followed the Supreme Court's lead and definitively held that foreign states are not entitled to the protections of the Due Process Clause.

The D.C. Circuit gave the most thorough explanation. It said that conferring due process protections to foreign states was "not only textually and structurally unsound, but it would distort the very notion of 'liberty' that underlies the Due Process Clause." *Price*, 294 F.3d at 99. According to that court, common usage of the term "person" didn't "include the sovereign." *Id.* at 96 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989)). Indeed, the court said, "foreign states stand on a fundamentally different footing than do private litigants who are compelled to defend themselves in American courts." *Id.* at 98. Unlike most "person[s]," "foreign nations are the juridical equals of the government that seeks to assert jurisdiction over them." *Id.*

And structurally, the D.C. Circuit described foreign states as "entirely alien to our constitutional system." *Id.* at 96. Even though domestic States "derive important benefits and must abide by significant limitations as a consequence of their participation," they receive no protection under the Due Process Clause. *Id.* Given this, the D.C. Circuit reasoned that foreign states must also be excluded. *Id.* at 97. It would be "strange," the court observed, if domestic States, which were "integral and active participants in the Constitution's infrastructure," were unprotected by the Due Process Clause while foreign states were. *Id.* at 96.

"[H]istory and tradition" also counseled in favor of excluding foreign states from the Due Process Clause, according to the D.C. Circuit. *Id.* at 97. As a historical

matter, the "principles of comity and international law . . . protect[ed] foreign governments." *Id.* Thus, "[t]he most a foreign state can demand is that other states observe *international* law, not that they enforce provisions of domestic law." *Id.* (quoting Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 Va. L. Rev. 483, 520 (1987)). So "foreign states have available to them a panoply of mechanisms in the international arena through which to seek vindication or redress." *Id*. at 99 (citing Damrosch, *supra*, at 525).

Based on all this, the D.C. Circuit held that "[n]either the text of the Constitution, Supreme Court decisions construing the Due Process Clause, nor long standing tradition provide a basis for extending the reach of this constitutional provision for the benefit of foreign states." *Id*.

The Second Circuit and Seventh Circuit agree. *See Frontera*, 582 F.3d at 400 ("[F]oreign states are not 'persons' entitled to rights under the Due Process Clause."); *Abelesz*, 692 F.3d at 694 ("Other circuits have confronted the issue and have held that foreign states are not 'persons' entitled to rights under the Due Process Clause. . . . We agree."). After *Weltover*, no other circuit court has ruled otherwise.[2]

---

[2] Before *Weltover*, the Third Circuit and Fifth Circuit ruled that foreign states are entitled to due process. *See Velidor v. L/P/G Benghazi*, 653 F.2d 812, 819 n.12 (3d Cir. 1981) ("We must also inquire . . . whether the assertion of personal jurisdiction comports with the due process clause."); *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1107 n.5 (5th Cir. 1985) ("As with all suits, however, the exercise of personal jurisdiction must comply with the due process clause."). Both circuit courts cited Second Circuit precedent which has since been overruled. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981), *overruled by Frontera*, 582 F.3d at 399.

And the original meaning of the Due Process Clause supports the view that foreign states are not entitled to the protection of minimum contacts.

To be fair, recent scholarship has suggested foreign states were understood to be "persons" at the time of the Founding.  For example, one author argues that Founding-era sources show "foreign states were viewed as 'persons' entitled to 'process.'"  Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633, 637 (2019).  As an example, Emmerich de Vattel, an influential 18th-century international law scholar, wrote, "[t]he law of nations is the law of sovereigns: free and independent states are moral persons, whose rights and obligations we are to establish in this treatise."  Emmerich de Vattel, The Law of Nations or the Principles of Natural Law, bk. I, ch. I § 12 (1758) (Charles G. Fenwick trans., 1916).

Another disagrees.  According to this scholar, it is "unlikely that the framers of the Fifth Amendment would have viewed foreign states as persons given that foreign sovereigns were treated as completely immune from suit at the time of the founding."  Donald Earl Childress III, *Questioning the Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. Online 60, 70 (2019).

But even assuming some process is due—an emerging consensus shows that the original understanding of the Fifth Amendment's Due Process Clause does not require minimum contacts for foreign states.  Instead, these sources all agree that the political branches may dictate what process is afforded to foreign sovereigns.  As Professor Wuerth concludes, "[t]hat foreign states are protected by due process does not tell us what the content of those protections

are[.] . . . [W]hen it comes to personal jurisdiction, due process limitations may be largely coextensive with the process that Congress chooses to provide." Wuerth, *supra*, at 679–86; *see* Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1743 (2020) ("The Fifth Amendment bars the execution of a federal judgment only if the federal court lacked jurisdiction. And Congress gets to answer th[e jurisdiction] question."); Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447, 530–31 (2022) ("Because the Due Process of Law Clause requires process, . . . service on a defendant" may be "sufficient to validate personal jurisdiction whether or not the *International Shoe Co. v. Washington* minimum contacts test was satisfied." (simplified)).

Indeed, the view that Congress could legislate the bounds of jurisdiction over foreign sovereigns finds support in a well-known case from Justice Joseph Story. Riding circuit in 1828, Justice Story considered whether a French plaintiff could successfully obtain a default judgment against a Massachusetts defendant who was living in Paris. *Picquet v. Swan*, 19 F. Cas. 609, 609–10 (C.C.D. Mass. 1828) (No. 11,134). The plaintiff argued that attaching the Massachusetts property was a sufficient method of serving process on the Paris-residing Massachusetts resident. *Id.* Justice Story rejected the argument, concluding Congress had not clearly chosen to authorize that kind of extraterritorial jurisdiction and thus "there ha[d] been no sufficient service of the process." *Id.* at 613, 619. Even so, he explained that it was well within the power of Congress to have, "a subject of England, or France, or Russia . . . summoned from the other end of the globe to obey our process, and submit to the judgment of our courts." *Id.*

at 613.  Congress need only do so clearly.  *Id.* at 615 ("If congress had prescribed such a rule, the court would certainly be bound to follow it, and proceed upon the law.").  In sum, Justice Story opined that foreign-based defendants were owed no more than service authorized by Congress before being haled into our federal courts.

So modern jurisprudence, tugged by the gravitational pull of original meaning, points to excluding foreign states from the protection of minimum contacts.  Like every other circuit court post-*Weltover*, we should have followed suit.  This was yet another reason to take this case en banc.

## III.

Forty years ago, our court disregarded the plain language of the FSIA to add minimum contacts to the requirements for personal jurisdiction over a foreign state.  And we did so using questionable interpretive moves.  Today, the consensus among circuit courts squarely rejects any constitutional basis for a minimum-contacts regime.  So, yet again, the Ninth Circuit stands alone.  And when it comes to the law, experimentation isn't usually a virtue.

Our atextual reading creates a needless roadblock for plaintiffs seeking to assert their rights against foreign states and their agents.  And we are simply incompetent to interfere in these matters of foreign affairs.  Imagine requiring a state sponsor of terrorism to have minimum contacts with our country before allowing our citizens to vindicate the death or injury of a loved one at the hands of a terrorist.  *See* 28 U.S.C. § 1605A.  But that is the regime that the Ninth Circuit erects.

With no constitutional provision requiring otherwise, we should have deferred to the political branches here.  FSIA

plaintiffs deserve a full opportunity to litigate their cases as Congress determined. By freelancing in this area, we do the legislative process, separation of powers, and rule of law a disservice.

Faced with an opportunity to correct course, we again close the courthouse doors. And we refuse to act despite overwhelming evidence that our position is wrong. Our failure to fix our precedent is a serious mistake.

I respectfully dissent from the denial of rehearing en banc.